619

1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3

4  UNITED STATES OF AMERICA,    )
                                )
5             PLAINTIFF,         )
                                )
6  VS.                          ) 04-CR-1298-BEN
                                )
7  RICHARD D. CORONA,           ) SAN DIEGO, CALIFORNIA
   TRACY D. CORONA,             ) FRIDAY,
8                               ) JUNE 8, 2007
              DEFENDANTS.       ) 12:45 P.M.
9  ─────────────────────────────)

10

11

12

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          JURY TRIAL - DAY THREE

15     AFTERNOON SESSION, PAGES 619 - 699

16    BEFORE THE HONORABLE ROGER T. BENITEZ
          UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22        CAMERON P. KIRCHER, COURT REPORTER
           CSR NO. 9427, RPR, RMR, CRR
           880 FRONT STREET, ROOM 4290
23            SAN DIEGO, CA  92101
            PHONE:  (619) 239-4588
24           FAX: (619) 239-4589
           E-MAIL:  CPKIRCHER@CS.COM
25

COMPUTER-AIDED TRANSCRIPTION

620

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:      KAREN P. HEWITT
                              UNITED STATES ATTORNEY
 3                            BY:  CHRISTOPHER MAIETTA, ESQ.
                                   ANDREW DICKERSON, ESQ.
 4                            ASSISTANT UNITED STATES ATTORNEYS
                              880 FRONT STREET
 5                            FIFTH FLOOR
                              SAN DIEGO, CALIFORNIA  92101
 6

 7    FOR DEFENDANT
      RICHARD D. CORONA:      MICHAEL L. CROWLEY
 8                            ATTORNEY AT LAW
                              550 WEST C STREET, SUITE 1960
 9                            SAN DIEGO, CALIFORNIA  92101

10

      FOR DEFENDANT
11    TRACY D. CORONA:        MAXINE I. DOBRO
                              ATTORNEY AT LAW
12                            105 WEST F STREET
                              THIRD FLOOR
13                            SAN DIEGO, CALIFORNIA 92101

14

15

16

17

18

19

20

21

22

23

24

25
```

COMPUTER-AIDED TRANSCRIPTION

621

1                          INDEX TO WITNESSES

2      FOR THE GOVERNMENT                              PAGE:

3      HELFAND, JAMES

4        REDIRECT EXAMINATION BY MR. MAIETTA            623
         RECROSS-EXAMINATION BY MR. CROWLEY             633
5

6      SELBY, JOHN

7        DIRECT EXAMINATION BY MR. MAIETTA              642
         CROSS-EXAMINATION BY MR. CROWLEY               657
8        REDIRECT EXAMINATION BY MR. MAIETTA            659

9      EWAN, JOEL

10       DIRECT EXAMINATION BY MR. MAIETTA              661
         CROSS-EXAMINATION BY MR. CROWLEY               675
11       REDIRECT EXAMINATION BY MR. MAIETTA            678

12     HELSEL, CHUCK

13       DIRECT EXAMINATION BY MR. DICKINSON            680
         CROSS-EXAMINATION BY MR. CROWLEY               692
14       REDIRECT EXAMINATION BY MR. DICKINSON          694

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

622

1                          INDEX TO EXHIBITS

2       TRIAL EXHIBITS                        RECEIVED

3       GOVERNMENT'S:

4           5-14                                656
            5-15                                656
5           8-2                                 669

6

7       DEFENDANTS':

8           K                                   637

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

623

1      SAN DIEGO, CALIFORNIA – FRIDAY, JUNE 8, 2007 – 12:38 P.M.

2            THE COURT:  ALL RIGHT.  MR. MAIETTA, GO AHEAD.

3            MR. MAIETTA:  THANK YOU.

4                  REDIRECT EXAMINATION CONTINUED

5      BY MR. MAIETTA:

6      Q.   I BELIEVE BEFORE WE BROKE, MR. HELFAND, I HAD ASKED YOU

7      QUESTIONS ABOUT WHETHER MR. CORONA WAS TRUTHFUL IN REPORTING

8      ALL OF HIS INCOME TO YOU, AND YOU HAD RESPONDED BY SAYING,

9      YOU THOUGHT IT WAS MORE MAYBE NOT NECESSARILY GOING TO

10     TRUTHFULNESS, BUT MISLEADING.

11           IS THAT A FAIR CHARACTERIZATION OF WHAT WE DISCUSSED

12     BEFORE THE BREAK?

13     A.   YES.

14     Q.   OKAY.  I BELIEVE I HAD ALSO -- YOU WERE ABOUT TO GET

15     INTO PARK CENTRE PROPERTIES.  AND I DON'T KNOW IF THE COURT

16     REPORTER CAN EVEN GO BACK TO MY LAST QUESTION, WHICH MIGHT

17     MAKE MORE SENSE THAN ME TO ASK --

18           THE COURT:  THAT WOULD BE GREAT, BUT SHE DOESN'T

19     HAVE IT, SINCE WE HAVE A NEW COURT REPORTER.  BUT IF YOU GIVE

20     ME JUST A SECOND, I'LL TELL YOU WHAT IT IS.

21           THE LAST QUESTIONS WERE AS FOLLOWS:  AND HE HAD TOLD

22     YOU, BACK IN OCTOBER OR SOMETIME IN 1998, THAT HE DIDN'T HAVE

23     A K-1 FOR YOU.  DO YOU REMEMBER TESTIFYING TO THAT?  THAT'S

24     CORRECT.

25           AND DID YOU HAVE A CONCERN AT THAT TIME?  AND THEN

1    HE ANSWERED THAT QUESTION.

2            AND THEN I SAID, LET'S TAKE OUR LUNCH BREAK.

3            MR. MAIETTA:  OKAY.  THANK YOU.

4    Q.  AND WHY DIDN'T YOU HAVE A CONCERN AT THAT TIME?

5    A.  BECAUSE THE RETURN I WAS -- I THINK I DID START TO

6    ANSWER THIS, AND I GOT TWO-THIRDS OF THE WAY THROUGH.

7            THE RETURN THAT I WAS PREPARING WAS A DRAFT RETURN,

8    VERSUS THE ONE I WAS GOING TO BE SIGNING.  AND THE K-1 FOR

9    PARK CENTRE, THE NUMBERS ON IT WERE VERY INSIGNIFICANT, LIKE

10   LESS THAN A HUNDRED DOLLARS OR SO IN INCOME OR LOSS.

11           AND WHAT WAS THE THIRD REASON?  NOW, I CAN'T

12   REMEMBER.  THERE WAS ANOTHER REASON.

13           THE COURT:  DO YOU WANT ME TO TELL YOU?

14           THE WITNESS:  THESE ARE MY REASONS.  AND THERE IS

15   ANOTHER REASON WHY I WAS NOT CONCERNED ABOUT IT, BUT I CAN'T

16   REMEMBER NOW WHAT IT WAS.

17           THE COURT:  CAN WE MAKE MR. HELFAND'S LIFE A LITTLE

18   EASIER BY TELLING HIM WHAT HIS PRIOR TESTIMONY WAS?

19           MR. CROWLEY:  OH, SURE.

20           THE COURT:  ANYBODY HAVE ANY OBJECTION?

21           MR. CROWLEY:  NO.

22           THE COURT:  ALL RIGHT.  HERE IS WHAT YOU SAID IN

23   RESPONSE TO THE QUESTION, DID YOU HAVE A CONCERN AT THAT

24   TIME.

25           YOU SAID, WELL, I DIDN'T AT THE TIME I WAS PREPARING

625

1    THE RETURN, BECAUSE AS I STATED BEFORE, THE NUMBERS THAT SHOW

2    UP ON THAT K-1 FOR THE PARK CENTRE WERE VERY, VERY

3    INSIGNIFICANT NUMBERS, $100 OR SOMETHING.

4              THE WITNESS:  I JUST REMEMBERED --

5              THE COURT:  I WAS NOT AWARE THAT THE PARK CENTRE

6    PROPERTY HAD BEEN FORECLOSED, SO IT HAD NOT OCCURRED TO ME

7    THAT THERE WOULD BE A POTENTIAL LARGE GAIN ASSOCIATED WITH

8    THAT FORECLOSURE.

9              THE WITNESS:  THAT WAS THE ONE I HAD FORGOTTEN.

10   Q.   BY MR. MAIETTA:  WHICH WAS WHAT?

11   A.   I'M SORRY?

12   Q.   WOULD YOU REPEAT THAT ONE THAT YOU HAD FORGOTTEN.

13   A.   THAT I WAS NOT AWARE THAT THE -- THAT THE PROPERTY HAD

14   BEEN FORECLOSED WHEN I PREPARED THAT DRAFT RETURN.

15   Q.   AND YOU EVENTUALLY LEARNED THAT PARK CENTRE PROPERTIES

16   HAD BEEN FORECLOSED UPON; IS THAT RIGHT?

17   A.   I JUST -- I'M SORRY.  I CAN'T HEAR YOU.

18             MR. CROWLEY:  OBJECTION.

19   Q.   BY MR. MAIETTA:  DID YOU EVENTUALLY LEARN THAT THE PARK

20   CENTRE PROPERTIES HAD BEEN FORECLOSED?

21   A.   YES.

22   Q.   AND WHAT WOULD HAVE BEEN THE AMOUNT OF CAPITAL GAIN THAT

23   WOULD HAVE BEEN REPORTED ON THE K-1?

24   A.   THE AMOUNT THAT WAS REPORTED, APPROXIMATELY, I BELIEVE

25   WAS ABOUT 340,000.

1    Q.   AND THE CAPITAL GAIN INCOME?

2    A.   YES.

3    Q.   CAN YOU APPROXIMATE WHAT THE TAX WOULD HAVE BEEN ON

4    THAT, TO THE BEST YOU CAN ESTIMATE?

5    A.   I WOULD SAY THAT TAX WOULD BE APPROXIMATELY 70 TO 80,000

6    THOUSAND DOLLARS.

7    Q.   OKAY.  COULD YOU LOOK AT -- I HAVE A NOTEBOOK UP THERE,

8    MR. HELFAND -- 1-31; IF YOU COULD LOOK AT THAT.

9             THE CLERK:  WHAT IS THIS, COUNSEL?

10            MR. MAIETTA:  1-231.  I'M SORRY, 1-231.

11            THE WITNESS:  1-231.

12   Q.   BY MR. MAIETTA:  AND CAN YOU IDENTIFY WHAT THAT DOCUMENT

13   IS?

14   A.   THAT IS THE PARTNERSHIP TAX RETURN FROM 1994 FOR PARK

15   CENTRE PROPERTIES.

16            MR. MAIETTA:  THIS HAS ALREADY BEEN ADMITTED INTO

17   EVIDENCE, YOUR HONOR.

18            THE COURT:  OKAY.

19            MR. MAIETTA:  1-231.

20   Q.   IS THERE A K-1 IN THERE GOING TO MR. CORONA?

21   A.   YES, THERE IS.

22   Q.   MR. VIGIL, CAN YOU BRING THAT UP ON THE SCREEN.

23            IS MR. CORONA THE PARTNER ON THAT K-1?

24   A.   YES, HE IS.

25   Q.   IF YOU CAN GO UP A LITTLE FURTHER, MR. VIGIL, JUST TO

1    SHOW THE JURY.  AND IF WE GO TO THE NEXT PARTNERSHIP TAX

2    RETURN, 1065 FOR THE 1995 TAX YEAR.  IS THIS THE K-1 GOING TO

3    MR. CORONA?

4           IF YOU CAN FIND, PLEASE -- WHICH WILL REQUIRE

5    MR. VIGIL TO FIND IT, TOO.  AND I APOLOGIZE.  I CAN PROBABLY

6    GET TO THE PAGE NUMBER.  PAGE 8 OF 1-232, MR. VIGIL.

7           AND, MR. HELFAND, WHO IS -- OR IS MR. CORONA THE

8    PARTNER LISTED ON THE K-1?

9    A.   YES.

10   Q.   AND GOING TO 1996, WHICH IS 2 DASH -- OR 1-233, I

11   BELIEVE.  THERE IS A K-1 IN THERE.

12          IS MR. CORONA LISTED AS THE PARTNER IN PARK CENTRE

13   PROPERTIES?

14   A.   YES, HE IS.

15   Q.   AND THAT'S CONSISTENT WITH YOUR UNDERSTANDING THROUGHOUT

16   THOSE ENTIRE YEARS; IS THAT RIGHT?

17   A.   YES.

18   Q.   MR. CROWLEY HAD ASKED YOU SOME QUESTIONS ABOUT TAX

19   WITHHOLDINGS AND TAX PAYMENTS.  DID YOU EVER ADVISE

20   MR. CORONA THAT HE SHOULD NOT MAKE TAX PAYMENTS?

21   A.   NO.

22   Q.   IN YOUR LETTERS AND TRANSMITTAL LETTERS THAT YOU SENT TO

23   MR. CORONA IN '94, '95, '96 AND '97, DID YOU ADVISE

24   MR. CORONA THAT HE HAD TO PAY HIS TAXES?

25   A.   YES.

1    Q.   MR. CROWLEY ALSO ASKED YOU ABOUT PARK CENTRE PROPERTIES

2    AND THE FACT THAT YOU WERE INVOLVED IN THE, I GUESS THE

3    STRUCTURING OF THAT DEAL.

4             DO YOU RECALL THAT QUESTION?

5    A.   YES.

6    Q.   HE ALSO ASKED YOU WHETHER MR. SELBY HAD BECOME A PARTNER

7    AND MADE AN INVESTMENT.  DO YOU REMEMBER THAT QUESTION?

8    A.   YES.

9    Q.   I BELIEVE YOUR TESTIMONY WAS MR. SELBY HAD INVESTED

10   ABOUT $700,000?

11   A.   I COULDN'T REMEMBER THE AMOUNT.

12   Q.   A FEW HUNDRED THOUSAND; IS THAT FAIR?

13   A.   YES.  SEVERAL.

14   Q.   WAS THAT AN INVESTMENT?

15   A.   WAS IT --

16   Q.   AN INVESTMENT IN PARK CENTRE PROPERTIES?

17   A.   I BELIEVE IT WAS, YES.

18   Q.   IS IT ALSO CALLED A CONTRIBUTION; IS THAT A FAIR --

19   A.   A CONTRIBUTION TO THE PARTNERSHIP, I BELIEVE IT WAS.

20   Q.   DID THERE COME A TIME AROUND -- SHORTLY THEREAFTER THAT

21   THERE WAS A DISTRIBUTION OUT OF THE PARTNERSHIP TO

22   MR. CORONA?

23   A.   I BELIEVE THERE WAS, YES.

24   Q.   AND DO YOU KNOW IF MR. SELBY WAS AWARE OF THAT?

25   A.   I BELIEVE HE WAS NOT AT THAT TIME AWARE OF THAT.

1    Q.   HOW MUCH OF A DISTRIBUTION -- WHEN I USE THE WORD

2    "DISTRIBUTION," CAN YOU JUST TELL ME AND TELL THE JURY WHAT A

3    DISTRIBUTION IS.

4    A.   ALSO REFERRED TO AS A WITHDRAWAL BY A PARTNER.  SO A

5    DISTRIBUTION COULD BE IN THE FORM OF CASH OR PROPERTY OR THE

6    PARTNERSHIP DISTRIBUTES MONEY OR PROPERTY TO A PARTNER.

7    Q.   HOW MUCH DISTRIBUTION DID MR. CORONA TAKE?

8    A.   I DON'T KNOW THE EXACT AMOUNT.

9    Q.   CAN YOU ESTIMATE?

10   A.   I THINK IT WAS SOMEWHERE BETWEEN -- SOMETHING OVER --

11   WELL, IT WAS SEVERAL HUNDRED THOUSAND DOLLARS.  LET'S SAY

12   OVER 300,000, I BELIEVE.

13   Q.   AND WAS IT A CASH DISTRIBUTION, AS BEST YOU CAN

14   RECALL?

15   A.   I BELIEVE IT WAS.

16   Q.   AND DID THERE COME A TIME WHEN MR. SELBY LEARNED ABOUT

17   THAT?

18   A.   I BELIEVE SO.

19   Q.   BUT IT WASN'T AT THE SAME TIME THAT THE CASH

20   DISTRIBUTION WAS MADE; IS THAT FAIR TO SAY?

21   A.   THAT'S FAIR TO SAY, YEAH.

22   Q.   HOW DID MR. SELBY LEARN ABOUT THAT?

23        MR. CROWLEY:  OBJECTION.  CALLS FOR SPECULATION,

24   YOUR HONOR.

25        THE COURT:  SUSTAINED.

630

1    Q.   BY MR. MAIETTA:  IF YOU NEED TO LOOK AT SOME DOCUMENTS,

2    LET ME KNOW, BUT IF YOU RECALL, WHAT INCOME DID MR. CORONA

3    REPORT ON HIS FORM 1040-NR'S, IF ANY?

4    A.   I DON'T BELIEVE ANY INCOME.

5    Q.   FOR THE 1996 1040-NR?

6    A.   THAT'S MY UNDERSTANDING.

7    Q.   AND THE 1997?

8    A.   YES.

9    Q.   MR. CROWLEY ALSO ASKED YOU ABOUT WHETHER MR. CORONA HAD

10   PROVIDED YOU WITH ALL THE DOCUMENTS YOU NEEDED REGARDING THE

11   PARK CENTRE PROPERTIES.

12        DO YOU REMEMBER THAT?

13   A.   YES.

14        MR. CROWLEY:  OBJECTION.  MISSTATES THE EVIDENCE,

15   YOUR HONOR.

16        THE COURT:  OVERRULED.

17        THE WITNESS:  YES, I DO.

18   Q.   BY MR. MAIETTA:  DID MR. CORONA PROVIDE YOU ALL THE

19   DOCUMENTS?

20        THIS IS GOING TO FEBRUARY OF 1999, WHEN MR. CORONA

21   HAD APPROACHED YOU AND ASKED YOU TO PREPARE AMENDED TAX

22   RETURNS.  I JUST WANT TO FOCUS ON THAT TIME FRAME SO DEFENSE

23   KNOWS WHAT THE TIME FRAME IS, AND THE JURY.

24   A.   DID HE PROVIDE ME WITH ALL THE DOCUMENTS I ASKED FOR?

25   Q.   YES.

1    A.    NO, HE DID NOT.

2    Q.    AND WHAT WERE YOU LOOKING FOR?

3    A.    THAT WAS NOT PROVIDED OR --

4    Q.    YES.

5    A.    -- OR EVERYTHING?

6    Q.    THAT WAS NOT PROVIDED.

7    A.    THAT WAS NOT PROVIDED.  I NEEDED DOCUMENTATION RELATING

8    TO THE TRUST THAT WAS CREATED.

9    Q.    AND -- GO AHEAD.

10   A.    THE TRUST THAT WAS CREATED, WHICH WAS THE ENTITY TO

11   WHICH THE PARK CENTRE PARTNERSHIP INTEREST WAS TRANSFERRED.

12   Q.    DID YOU EVER GET THAT DOCUMENT?

13   A.    NO.

14   Q.    AND YOU WANTED THAT DOCUMENT?

15   A.    YES.

16   Q.    AND WHY IS THAT?

17   A.    THE TYPE OF TRUST WOULD HAVE A BEARING ON THE

18   DETERMINATION OF WHETHER THE TRANSFER WOULD BE RECOGNIZED

19   BACK IN 1994 WHEN IT OCCURRED, OR WHETHER IT WOULD BE

20   DISREGARDED.

21   Q.    OKAY.  AND, AGAIN, WHEN DID YOU FIRST LEARN ABOUT THIS

22   ALLEGED TRANSFER TO PARK CENTRE PROPERTIES?

23   A.    ON FEBRUARY 1999.

24   Q.    MR. CORONA HAD APPROACHED YOU DURING THE YEARS -- I

25   GUESS 1996, '97, '98 -- WITH TWO DIFFERENT TAX THEORIES.  DO

632

1    YOU REMEMBER TESTIFYING TO THAT?  MR. CROWLEY HAD ASKED YOU

2    ABOUT THAT.

3    A.   YES.

4    Q.   AND HE JUST WANTED A TAX SOLUTION, IS THAT WHAT HE WAS

5    TRYING TO FIND, TO CHEAT ON HIS TAXES; IS THAT REALLY WHAT HE

6    WAS DOING?

7    A.   SAY THE LAST PART OF THAT.

8    Q.   HE DIDN'T WANT TO PAY HIS TAXES.  THAT'S WHAT HE WAS

9    DOING?

10   A.   THAT'S CORRECT.

11   Q.   AND YOU HAD INFORMED HIM IN YOUR LETTERS THAT HE HAD TO

12   PAY THE TAXES; IS THAT RIGHT?

13   A.   MY LETTER DIDN'T SAY, YOU HAVE TO PAY YOUR TAXES.  MY

14   LETTER SAID THAT THE RETURN REFLECTS TAXES OF SO MUCH AND

15   SHOULD BE REMITTED, A REMITTANCE SHOULD BE SENT WITH THE

16   RETURN.

17   Q.   DID MR. CORONA EVER TELL YOU THAT HE WAS GOING TO

18   RESCIND HIS SOCIAL SECURITY NUMBER?

19   A.   NO, NOT THAT I RECALL.

20   Q.   AND WHEN YOU WOULD HAVE PREPARED HIS CORPORATE RETURNS

21   AND HIS INDIVIDUAL RETURNS, YOU WOULD HAVE USED HIS SOCIAL

22   SECURITY NUMBER?

23   A.   YES.

24        MR. MAIETTA:  ONE MOMENT, YOUR HONOR, TO CONFER WITH

25   COUNSEL.

633

1          NO FURTHER QUESTIONS, YOUR HONOR.

2          THE COURT:  ALL RIGHT.  MR. CROWLEY, RECROSS.

3          MR. CROWLEY:  THANK YOU, YOUR HONOR.

4                    RECROSS-EXAMINATION

5     BY MR. CROWLEY:

6     Q.   GOOD AFTERNOON NOW, MR. HELFAND.

7          I, OF COURSE, WANT TO TALK TO YOU ABOUT WHERE YOU

8     THOUGHT THAT YOU WERE MISLED.  AND THAT HAD TO DO WITH, IT

9     SEEMS TO ME -- AND MAYBE I WAS WRONG, BECAUSE I WAS WRONG

10    ABOUT THE OTHER THING -- THAT IT WAS FIRST HE SAID THAT HE

11    DIDN'T HAVE THE K-1, BUT THEN HE SAID THAT IT HAD BEEN

12    TRANSFERRED TO THE TRUST; IS THAT --

13    A.   THAT'S CORRECT.

14    Q.   OKAY.  AND SO -- AND THAT WAS -- DO YOU RECOLLECT WHEN

15    EXACTLY ANY OF THOSE CONVERSATIONS TOOK PLACE?

16    A.   WELL, THE ORIGINAL CONVERSATION, WHEN HE INFORMED ME

17    THAT HE HAD NOT RECEIVED A K-1, WAS BACK WHEN I WAS PREPARING

18    THE DRAFT RETURN; THAT WOULD BE -- THAT WOULD HAVE BEEN BACK

19    IN 1998.  I CAN'T REMEMBER THE DATE WHEN THAT DRAFT RETURN

20    WAS TRANSMITTED TO HIM, BUT WHENEVER THAT -- AROUND THAT

21    DATE.

22          AND THEN THE SUBSEQUENT CONVERSATION IN FEBRUARY OF

23    1999, WHEN I WAS ASKED TO DO THE AMENDED RETURNS, WAS WHEN HE

24    INDICATED OTHERWISE, THAT HE HAD DONE THE TRANSFER TO THE

25    TRUST.

634

1    Q.   I SEE.  OKAY.  SO INITIALLY, BACK WHEN YOU WERE JUST

2    DOING THE DRAFT RETURNS, IT ONLY -- HE ONLY MENTIONED THAT HE

3    DIDN'T HAVE THE K-1.  AND I PRESUME THAT THAT WAS PART OF A

4    LARGER CONVERSATION ABOUT FILING A DRAFT OR NOT FILING A

5    DRAFT AND WHAT WOULD BE THE NUMBERS THAT WOULD BE USED FOR

6    THE DRAFT; IS THAT FAIR TO SAY?

7    A.   YES.  THAT'S TRUE.

8    Q.   AND IT WAS A DISCUSSION, OF COURSE, THAT HAD TO DO WITH

9    HIS OVERALL TAX SITUATION; RIGHT?

10   A.   YES.

11   Q.   AND PART OF THAT -- AT THAT TIME, HE SAID THAT HE DIDN'T

12   HAVE THE K-1 FOR IT.

13        NOW, SUBSEQUENT TO THAT, AND, OF COURSE, PART OF

14   YOUR LETTER OF MARCH 22ND AND ONE OF THE THINGS YOU ASKED

15   FOR, WAS DOCUMENTS CONCERNING THE PARTNERSHIP OR CONCERNING

16   THE TRUST TRANSFER.  THAT'S ONE THING YOU ASKED FOR; ISN'T

17   THAT RIGHT?

18   A.   YES.

19   Q.   AND THAT'S WHAT YOU -- AND, IN FACT, YOU RECEIVED IT,

20   DID YOU NOT?

21   A.   I RECEIVED THE PARTNERSHIP AGREEMENT THAT REFLECTED THE

22   TRUST AS THE PARTNER.

23   Q.   AND DO YOU REMEMBER WHAT THE DATE OF THAT TRANSFER WAS?

24   I MEAN, OF THAT PARTNERSHIP AGREEMENT.

25   A.   NO.

COMPUTER-AIDED TRANSCRIPTION

635

1   Q.   LET ME SHOW YOU --

2   A.   I REMEMBER THE YEAR.

3          MR. CROWLEY:  OKAY.  LET ME BE A LITTLE MORE

4   PRECISE.

5          LET ME HAVE MARKED, FOR IDENTIFICATION, DEFENDANTS'

6   EXHIBIT K, A FOUR-PAGE DOCUMENT THAT HAS BATES STAMPS AT THE

7   BOTTOM, GP 5100 THROUGH 5103.

8          LET ME SHOW THAT TO YOU.

9          THE COURT:  MAY I SEE THAT?

10          GO AHEAD, MR. CROWLEY.

11   Q.   BY MR. CROWLEY:  DOES THAT APPEAR TO BE WHAT YOU

12   RECEIVED FROM MR. CORONA?

13   A.   NO.

14   Q.   OH, IT DOESN'T?

15   A.   NO.

16   Q.   THAT'S WHY IT TOOK YOU SO LONG?

17   A.   YES.

18   Q.   OKAY.  DID YOU RECEIVE SOMETHING SIMILAR CONCERNING AN

19   AMENDMENT TO THE PARTNERSHIP AGREEMENT?

20   A.   YEAH.  I RECEIVED SOMETHING SIMILAR TO THAT.

21   Q.   OKAY.  AND YOUR RECOLLECTION IS THAT IT CONCERNED AN

22   AMENDMENT TO THE PARTNERSHIP; IS THAT RIGHT?

23   A.   YES.

24   Q.   AND THAT IT CONCERNED PART OF THE PARTNERSHIP -- THERE

25   WAS ACTUALLY TWO TRANSFERS MEMORIALIZED IN THAT PARTNERSHIP

636

1    AGREEMENT.  DO YOU REMEMBER THAT?

2    A.   I CAN'T REMEMBER TWO, BECAUSE I THINK I WAS ONLY FOCUSED

3    ON ONE.

4    Q.   OKAY.  WELL, MR. SELBY TRANSFERRED HIS INTEREST TO A

5    CORPORATION.  DO YOU REMEMBER THAT?

6    A.   YES.

7         MR. MAIETTA:  OBJECTION.  ASSUMES FACTS NOT IN

8    EVIDENCE AT THIS POINT.

9         MR. CROWLEY:  THAT'S WHY I'M ASKING HIM.

10        THE COURT:  WELL, NOT ANYMORE.  HE JUST SAID -- THE

11   ANSWER WAS YES, SO...

12   Q.   BY MR. CROWLEY:  OKAY.  AND THEN SO THAT WAS THE SECOND

13   TRANSFER FROM THIS PARTNERSHIP AGREEMENT; IS THAT RIGHT?

14   A.   YES.

15   Q.   OKAY.  AND THE OTHER TRANSFER WAS FROM MR. CORONA TO --

16   THANKS TO CO-COUNSEL BEING VERY ASSISTING, LET ME WITHDRAW

17   THAT EXHIBIT K.

18        SEE IF THIS ONE LOOKS ANY BETTER TO YOU AND

19   REFRESHES YOU IN ANY WAY.  I'LL TAKE THAT ONE BACK, IF IT'S

20   OKAY.

21        THE COURT:  IT'S NOT FAIR, TRYING TO CONFUSE THE

22   JUDGE, MR. CROWLEY.

23        MR. CROWLEY:  NO INTENT, YOUR HONOR.

24        THE COURT:  APOLOGIZE IF YOU ALL THOUGHT I HAD A

25   SORT OF BEWILDERED, PUZZLED LOOK ON MY FACE.

1      THE CLERK:  COUNSEL, WHAT EXHIBIT IS IT?  STILL K?

2      MR. CROWLEY:  YEAH.  WITHDRAWING THE OLD K, CROSSING

3  IT OUT, AND THE NEW K IS IN FRONT OF HIM.

4      MS. DOBRO:  EXCUSE ME.

5      JUST TO CLEAR UP, IT APPEARS AT 516 IN YOUR

6  NOTEBOOK, MR. MAIETTA.  AND THE THREE EXHIBITS PRECEDING IT

7  ARE ALL THE SAME, WITH THE EXCEPTION OF ONE NAME.

8      MR. CROWLEY:  IT'S ACTUALLY AN EXHIBIT THAT I

9  ANTICIPATE WILL COME INTO EVIDENCE THROUGH A GOVERNMENT

10  WITNESS, BECAUSE THEY ALREADY HAVE A NUMBER ON IT.

11  Q.  IS THAT THE ONE YOU HAD RECEIVED, YOU THINK?

12  A.  I BELIEVE THAT IS, YES.

13  Q.  OKAY.  AND IT SHOWS THE TRANSFER FROM -- CAN I HAVE IT

14  BACK -- THE TRANSFER FROM MR. CORONA TO THE TRUST; RIGHT?

15  A.  THAT'S CORRECT.

16      MR. CROWLEY:  I WOULD OFFER DEFENDANTS' EXHIBIT K,

17  YOUR HONOR.

18      THE COURT:  ANY OBJECTION?

19      MR. MAIETTA:  NO OBJECTION.

20      THE COURT:  OKAY.  IT WILL COME IN.

21    (DEFENDANTS' EXHIBIT K RECEIVED IN EVIDENCE.)

22      MR. CROWLEY:  I WOULD LIKE TO TRY TO PUT IT UP ON

23  THE SCREEN.  SORRY FOR THE DELAY.

24      I WAS DOING SO WELL IN NOT DELAYING.  ANYWAY, LET ME

25  SHOW YOU DEFENDANTS' EXHIBIT K, AND THEN IF WE GET IT UP, IT

638

1   WILL BE ALL THE BETTER.

2   Q.   YOU SEE UP IN THE TOP RIGHT-HAND CORNER WHEN THAT WAS

3   RECORDED?

4   A.   YES.

5   Q.   OKAY.  AND WHAT IS THE DATE ON THAT?

6   A.   THAT'S NOVEMBER 14TH, 1997.

7   Q.   OKAY.  1997.  AND SO THAT WAS, WHAT, APPROXIMATELY A

8   YEAR BEFORE MR. CORONA TALKED TO YOU ABOUT THE MISSING K-1?

9   A.   YES.

10  Q.   OKAY.  AND JUST TO -- THERE WAS THE POSSIBILITY OF SOME

11  CONFUSION.

12         YOU'VE NEVER SEEN OR HAD ANY EVIDENCE OF MR. CORONA

13  EVER HIDING ANY MONEY; IS THAT CORRECT?

14  A.   THAT'S CORRECT.

15  Q.   OKAY.  AND THERE WAS -- AND YOU, AFTER THIS, EVEN THOUGH

16  YOU RESIGNED FROM DOING HIS PERSONAL RETURNS, YOU STILL

17  WORKED WITH HIM AS A CONSULTANT; CORRECT?  WITH CLIENTS?

18  A.   WITH CLIENTS, YES.

19  Q.   I UNDERSTAND THE DISTINCTION.  IN OTHER WORDS, HE WOULD

20  REFER YOU CLIENTS, BUT OFTENTIMES THOSE WERE SITUATIONS WHERE

21  THERE WOULD BE -- HE WOULD BE THE ATTORNEY AND YOU WERE THE

22  PERSON CONSULTING ON THE ISSUE; CORRECT?

23  A.   YES.

24  Q.   OKAY.  SO OBVIOUSLY HE HAD A LOT OF FAITH IN YOU, TO

25  BRING YOU IN AS ESSENTIALLY AN EXPERT CONSULTANT.  YOU

1   BELIEVE THAT TO BE TRUE?

2   A.   I WOULD HOPE SO.

3   Q.   OKAY.  AND, LIKEWISE, YOU WORKED WITH HIM, DIDN'T HAVE

4   ANY CONCERNS ABOUT WORKING WITH HIM; RIGHT?

5   A.   THAT'S CORRECT.

6   Q.   AND, IN FACT, I THINK THAT YOU WORKED WITH HIM ON A CASE

7   THAT YOU MENTIONED THAT WAS A RATHER UNIQUE CASE, IN THAT IT

8   CONCERNED ABOUT WHETHER THERE WOULD BE -- THE RECOVERY WOULD

9   BE TAXABLE OR NOT; ISN'T THAT RIGHT?

10  A.   THAT'S CORRECT.

11           MR. MAIETTA:  OBJECTION.  BEYOND THE SCOPE.

12           THE COURT:  SUSTAINED.

13  Q.   BY MR. CROWLEY:  WHEN YOU SENT OUT THE TRANSMITTAL

14  LETTER WITH RETURNS LIKE YOU SENT TO MR. CORONA, AND I THINK

15  YOU CORRECTLY NARROWED IT, IN THAT YOU STATE IN THOSE LETTERS

16  HOW MUCH IS DUE FROM THE RETURN, THAT'S A PRETTY NORMAL

17  LETTER THAT YOU SEND OUT TO CLIENTS, ISN'T IT?

18  A.   THAT'S THE STANDARD LETTER.

19  Q.   STANDARD LETTER.  AND YOU JUST CHANGE THE NUMBERS; WOULD

20  THAT BE FAIR TO SAY?

21  A.   THAT'S CORRECT.

22  Q.   AND THE NUMBERS REFLECT WHAT YOU -- WHAT THE RETURN

23  SHOWS; RIGHT?

24  A.   CORRECT.

25  Q.   AND YOU DIDN'T, WEREN'T ABLE TO -- WELL, WE TALKED ABOUT

640

1    THE TIMING OF WHEN YOU RESIGNED FROM THE ACCOUNT.  AND IT WAS

2    BEFORE YOU WERE INTERROGATED OR QUESTIONED BY THE GOVERNMENT;

3    RIGHT?

4            MR. MAIETTA:  OBJECTION.  BEYOND THE SCOPE.

5            THE COURT:  I BELIEVE IT IS.

6            MR. CROWLEY:  WELL, HE WENT INTO, WHAT I HAVE IN MY

7    NOTES WAS THAT HE WAS SAYING HE NEVER DID ANYTHING

8    CONCERNING -- NEVER RECEIVED THE TRUST, THE IRREVOCABLE TRUST

9    DOCUMENTS; SO I NEED TO SHOW THAT IT WAS BECAUSE OF THE

10   TIMING.

11           THE COURT:  WHY DON'T YOU ASK HIM THAT QUESTION.

12           MR. CROWLEY:  OKAY.  THAT'S WHAT I WAS TRYING TO GET

13   TO, INARTFULLY I MIGHT ADD.

14   Q.   MR. MAIETTA ASKED YOU -- MAYBE THIS IS MUCH CLEARER.

15           MR. MAIETTA ASKED YOU ON REDIRECT ABOUT WHETHER YOU

16   HAD EVER RECEIVED THE IRREVOCABLE TRUST, OR WHATEVER IT WAS

17   CALLED, THE CORONA FAMILY TRUST DOCUMENTS, AND YOU SAID NO;

18   RIGHT?

19   A.   THAT'S CORRECT.

20   Q.   OKAY.  AND THAT WAS PART OF WHAT YOU HAD BEEN ASKING FOR

21   IN THE MARCH 22ND LETTER; RIGHT?

22   A.   YES.

23   Q.   AND YOU RECEIVED SOME DOCUMENTS FROM MR. CORONA, BUT

24   ESSENTIALLY YOU RESIGNED WITHIN A FEW DAYS OF THE DATE THAT

25   LETTER WAS MAILED OUT, DIDN'T YOU?

1    A.   I CAN'T REMEMBER THE DATE, THE EXACT DATE OF THAT

2    RESIGNATION.

3    Q.   IT WAS BEFORE YOU MET WITH THE GOVERNMENT; IS THAT

4    RIGHT?

5    A.   I BELIEVE SO.

6    Q.   OKAY.  AND THAT WAS -- AND I CAN SHOW YOU, IF YOU'D

7    LIKE, BUT DOES MARCH 25TH SOUND CORRECT?

8    A.   THAT SOUNDS REASONABLY CORRECT.

9            MR. MAIETTA:  OBJECTION.

10           THE COURT:  WHAT'S THAT?

11           MR. MAIETTA:  OBJECTION.  IT'S GOING BEYOND THE

12   SCOPE OF REDIRECT.

13           THE COURT:  I DON'T KNOW IF IT'S GOING BEYOND THE

14   SCOPE, BUT IT HAS BEEN ASKED AND ANSWERED.  I THINK IT WAS

15   THREE DAYS AFTERWARDS OR SOMETHING, MR. CROWLEY.

16           MR. CROWLEY:  I'LL ACCEPT YOUR TESTIMONY, YOUR

17   HONOR.

18           THE COURT:  I'M NOT UNDER OATH, BUT I THINK THAT'S

19   WHAT MY RECOLLECTION IS, THREE DAYS LATER.

20           MR. CROWLEY:  VERY WELL.  THANK YOU.

21           I HAVE NOTHING FURTHER.

22           THE COURT:  YOU BET.

23           ALL RIGHT.  MS. DOBRO.

24           MS. DOBRO:  ONE MOMENT, PLEASE.

25           NOTHING FURTHER, YOUR HONOR.  THANK YOU.

1          THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP

2     DOWN.

3          MR. MAIETTA, PLEASE CALL YOUR NEXT WITNESS.

4          MR. MAIETTA:  THE UNITED STATES CALLS JOHN SELBY TO

5     THE WITNESS STAND.

6          THE COURT:  OKAY.  MR. SELBY, COME ON UP.

7          THE CLERK:  RAISE YOUR RIGHT HAND.

8     JOHN SELBY, A GOVERNMENT WITNESS, HAVING BEEN DULY

9          SWORN, TESTIFIED AS FOLLOWS:

10         THE CLERK:  STATE YOUR FULL NAME FOR THE RECORD,

11    SPELLING BOTH YOUR FIRST AND LAST NAME.

12         THE WITNESS:  JOHN, J-O-H-N.  SELBY, S-E-L-B-Y.

13                    DIRECT EXAMINATION

14    BY MR. MAIETTA:

15    Q.   GOOD AFTERNOON, MR. SELBY.

16    A.   GOOD AFTERNOON.

17    Q.   MR. SELBY, WHERE DO YOU LIVE?

18    A.   I LIVE AT 10640 NOAKES ROAD, LA MESA.

19    Q.   AND WHERE DO YOU WORK?

20    A.   MY OFFICE IS IN MY HOME.

21    Q.   AND WHAT DO YOU DO FOR A LIVING?

22    A.   I INVEST IN AND WE DEVELOP COMMERCIAL REAL ESTATE.

23    Q.   WHAT'S YOUR EDUCATIONAL BACKGROUND?

24    A.   I HAVE A BACHELOR OF SCIENCE DEGREE FROM THE U.S.

25    MILITARY ACADEMY AT WEST POINT, AND I HAVE A MASTER'S IN

1    ENGINEERING FROM TEXAS A&M UNIVERSITY.

2    Q.   DID THERE COME A TIME WHEN YOU BEGAN LIVING HERE IN

3    SAN DIEGO?

4    A.   YES.

5    Q.   AND DO YOU RECALL THE TIME, THE YEAR?

6    A.   1972.

7    Q.   AND AROUND THAT TIME, WHAT WERE YOU DOING FOR A

8    LIVING?

9    A.   I WAS IN THE ARMY CORPS OF ENGINEERS.

10   Q.   DID THERE COME A TIME WHEN YOU OPENED YOUR OWN

11   BUSINESS?

12   A.   YES.

13   Q.   AND WHAT TYPE OF BUSINESS WAS THAT?

14   A.   I GOT OUT OF THE MILITARY IN '75 AND BECAME -- WENT TO

15   WORK FOR A CONSTRUCTION COMPANY.  AND THEN I BECAME A

16   CONSULTANT, AND FINALLY HAD A CONSTRUCTION COMPANY, JOHN R.

17   SELBY, INC., WHICH WAS AROUND 1979.

18   Q.   DURING THE TIME YOU WERE WORKING AT THE CONSTRUCTION

19   COMPANY, DID YOU MEET MR. CORONA?

20   A.   YES.

21   Q.   AND DO YOU SEE MR. CORONA IN THE COURTROOM TODAY?

22   A.   YES, I DO.

23   Q.   AND DO YOU KNOW HIS WIFE, TRACY CORONA?

24   A.   YES, I DO.

25   Q.   AND CAN YOU JUST IDENTIFY THEM BY WHERE THEY ARE

1    SEATED?

2    A.    RICK IS OVER THERE (INDICATING).    TRACY IS OVER THERE

3    (INDICATING).

4            THE COURT:   CLOSE ENOUGH.   THE RECORD WILL REFLECT

5    THAT HE IDENTIFIED THEM.

6            MR. MAIETTA:   THANK YOU.

7    Q.    HOW DID YOU MEET MR. CORONA?   WAS IT THROUGH A BUSINESS

8    RELATIONSHIP OR WAS IT SOCIAL OR HOW?

9    A.    IT WAS BUSINESS.

10   Q.    AND CAN YOU APPROXIMATE THE YEAR AGAIN?

11   A.    THAT WAS PROBABLY LATE 1975.

12   Q.    AND OVER THE PAST 32 YEARS, HOW WOULD YOU DESCRIBE THE

13   RELATIONSHIP:   FRIENDS, BUSINESS PARTNERS?

14   A.    WE'VE HAD A FEW BUSINESS DEALINGS.   WE'VE BEEN

15   FRIENDS.

16   Q.    PRETTY GOOD RELATIONSHIP?

17   A.    YES.

18   Q.    WAS THERE A TIME IN THE EARLY 1980'S WHEN MR. CORONA

19   APPROACHED YOU WITH AN OFFER TO BE A PARTNER IN PARK CENTRE

20   PROPERTIES?

21   A.    YES.

22   Q.    AND CAN YOU TELL US ABOUT THAT.

23   A.    HE SAID THAT HE, WITH A GROUP, HAD DEVELOPED AN OFFICE

24   BUILDING CALLED PARK CENTRE, AND THAT HE AND HIS PARTNERS

25   WERE GOING TO BREAK UP; AND HE WANTED ME TO BE AN INVESTOR,

1    TO COME IN AND PROVIDE CAPITAL AND BE A PARTNER WITH HIM.

2    Q.   WHAT MADE YOU INTERESTED, OR WERE YOU INTERESTED IN

3    JOINING THE PARTNERSHIP?

4    A.   IT WAS A FRIEND ASKING ME TO DO SOMETHING.  I HAD IT

5    REVIEWED BY MY CPA'S, WHO WAS THEN LLOYD, HASKINS & SELLS.

6    THEY PUT THEIR BLESSING ON IT, AND WE PUT TOGETHER THE

7    PARTNERSHIP AND DID IT.

8    Q.   CAN YOU REMEMBER HOW MUCH OF AN INVESTMENT YOU MADE IN

9    PARK CENTRE PROPERTIES?

10   A.   I DON'T RECALL.

11   Q.   CAN YOU APPROXIMATE?  WAS IT $100, $2,000?

12   A.   OH, PROBABLY A COUPLE HUNDRED THOUSAND.

13   Q.   OKAY.  WHAT WAS PARK CENTRE PROPERTIES, ITS PHYSICAL

14   STRUCTURE?

15   A.   IT'S A BUILDING ON 5TH AVENUE HERE IN SAN DIEGO THAT WAS

16   A SINGLE-TENANT BUILDING, ABOUT 30,000 SQUARE FEET.  AND

17   THERE WAS A SINGLE USER, WHO WAS MEPS, THE MILITARY ENTRANCE

18   PROCESSING WHATEVER IT IS, WHERE THEY BROUGHT PEOPLE INTO THE

19   MILITARY; SO IT WAS A GOVERNMENT CONTRACT, GOVERNMENT

20   LEASE.

21   Q.   WERE THEY THE TENANT THE ENTIRE TIME PARK CENTRE

22   PROPERTIES WAS IN EXISTENCE?

23   A.   YES.

24   Q.   AND WHEN YOU FIRST BECAME INVOLVED IN PARK CENTRE

25   PROPERTIES, WHO HANDLED THE BOOKS AND RECORDS?

1    A.    MR. CORONA.

2    Q.    AND DID THERE COME A TIME WHEN YOU EVENTUALLY TOOK OVER

3    THE BOOKS AND RECORDS?

4    A.    YES.

5    Q.    THE FINANCES?

6    A.    YES.

7    Q.    WERE YOU INVOLVED IN THE FINANCES, OR DID YOU HAVE AN

8    ACCOUNTANT HELP YOU?

9    A.    WELL, AT THAT TIME, I HAD A FULL-TIME CHIEF FINANCIAL

10   OFFICER, WHO WAS A C.P.A.  HE DID IT FOR ME, IN CONJUNCTION

11   WITH WHOEVER PREPARED MY TAX RETURNS, AND OUR TAX ATTORNEY.

12   Q.    WHO WAS THAT AT THAT TIME?

13   A.    THE TAX ATTORNEY?

14   Q.    YEAH.

15   A.    GARY ARMSTRONG.

16   Q.    WHO PREPARED THE PARK CENTRE PROPERTY TAX RETURNS?

17   A.    I THINK IT WAS TOM BERRY, IN CONJUNCTION WITH

18   PAUL CHAMPLIN, CHAMPION, SOMETHING LIKE THAT.

19   Q.    DID THERE COME A TIME WHEN THAT CHANGED?

20   A.    YES.  MR. BERRY WAS NO LONGER IN MY EMPLOY IN THE EARLY

21   '90S, AND I TRANSFERRED IT OVER TO THE C.P.A. I WAS USING AT

22   THE TIME, STEVE MARTIN.

23   Q.    DID HE REMAIN THE -- WAS HE A C.P.A.?

24   A.    YES.

25   Q.    AND DID HE REMAIN THE C.P.A. PREPARING THE TAX RETURNS

1    THROUGHOUT THE TIME PARK CENTRE WAS IN EXISTENCE?

2    A.   THROUGHOUT THE TIME THAT I HAD -- NO LONGER HAD BERRY

3    DOING IT, AND HE WAS DOING IT.

4    Q.   WHAT WAS THE OTHER INTEREST IN JOINING PARK CENTRE

5    PROPERTIES?  WHAT WAS YOUR UNDERSTANDING YOU WERE GOING TO

6    GET FROM THAT, SOME TYPE OF TAX BENEFIT, OR WAS IT SOMETHING

7    ELSE?

8    A.   WELL, IT WAS AN INVESTMENT IN A PIECE OF REAL ESTATE.

9    HOPEFULLY, IT WOULD GO UP IN VALUE.  THE ACCOUNTANTS TOLD ME

10   THAT I WOULD BE ABLE TO WRITE OFF CERTAIN LOSSES AND THAT

11   SORT OF THING.

12   Q.   AND HOW DID MR. CORONA PROPOSE THE OFFER TO YOU?  DID HE

13   TELL YOU YOU MIGHT BE ABLE TO GET SOME TAX BENEFITS FROM

14   THIS?

15   A.   HE GAVE ME SOME DOCUMENTS AND A PROPOSAL OUTLINING THE

16   DEAL, WHICH I HAD REVIEWED BY THE ACCOUNTANT.

17   Q.   BUT IN YOUR ORAL DISCUSSIONS WITH MR. CORONA, WHEN HE

18   APPROACHED YOU AND SAID, MR. SELBY, OR JOHN, WOULD YOU BE

19   INTERESTED IN THIS PARTNERSHIP, DID HE TELL YOU ABOUT TAX

20   BENEFITS THAT YOU MIGHT HAVE AS A RESULT OF THIS, OR DID YOU

21   ASK?

22   A.   IT MAY HAVE BEEN DISCUSSED.  I DON'T REMEMBER.

23   Q.   OKAY.  YOU MENTIONED EARLIER THAT MEPS WAS THE TENANT AT

24   PARK CENTRE PROPERTIES.

25   A.   YES.

648

1    Q.   DID THERE COME A TIME WHEN YOU LEARNED THAT THEY WOULD

2    BE MOVING OUT OF PARK CENTRE PROPERTIES?

3    A.   YES.

4    Q.   AND DO YOU REMEMBER WHEN THAT WAS?

5    A.   IT WAS SOMETIME IN THE MID 1990'S.

6    Q.   WAS THAT SOMETHING THAT YOU KNEW ABOUT, OR THEY WERE

7    GOING TO BE LEAVING AT SOME POINT?

8    A.   WELL, AT SOME POINT THEIR LEASE WOULD EXPIRE, AND THEY

9    HAD THE RIGHT TO GO OUT AND FIND DIFFERENT QUARTERS.

10   Q.   DID YOU AND MR. CORONA -- WELL, LET ME STOP THERE.

11          IN 1994, WHO WERE THE TWO PARTNERS IN PARK CENTRE

12   PROPERTIES?

13   A.   PROBABLY IT WAS MR. CORONA AND EITHER MYSELF OR ONE OF

14   MY CORPORATIONS, JOHN N BLAKE, INC.

15   Q.   AND WHAT IS JOHN N BLAKE, INC.?

16   A.   IT'S A CORPORATION THAT MY WIFE OWNED AT THE TIME.  IT'S

17   NO LONGER IN EXISTENCE.

18   Q.   SO WOULD YOU SAY BY '94 OR '95, YOU KNEW AT SOME POINT

19   THE LEASE WAS GOING TO TERMINATE FOR MEPS?

20   A.   SOMETIME IN THAT TIME FRAME, YES.

21   Q.   WERE THERE ATTEMPTS BY YOU AND MR. CORONA TO FIND

22   ANOTHER TENANT TO REPLACE MEPS?

23   A.   WE LOOKED AT THE MARKET AT THAT TIME.  THE REAL ESTATE

24   MARKET WAS PRETTY DEAD HERE IN SAN DIEGO, AND THERE WERE ALL

25   KINDS OF BUILDINGS WITH SPACE AVAILABLE.

649

1    Q.   SO YOU WERE UNSUCCESSFUL IN FINDING A TENANT?

2    A.   THAT'S CORRECT.

3    Q.   AS A RESULT OF NOT BEING ABLE TO FIND A TENANT, WHAT

4    HAPPENED TO THE PROPERTY?

5    A.   THE PROPERTY WENT BACK TO THE LENDER.

6    Q.   DID YOU UNDERSTAND THAT AS A RESULT OF THE WAY THE

7    PROPERTY HAD BEEN HANDLED, THERE WOULD BE POSSIBLE TAX

8    CONSEQUENCES BECAUSE OF THE FORECLOSURE?

9    A.   I WAS TOLD BY THE PEOPLE PREPARING MY RETURNS THAT THERE

10   WOULD BE, YES.

11   Q.   WHAT DID THEY TELL YOU?

12   A.   THAT THERE WOULD BE TAX CONSEQUENCES, THERE WOULD BE A

13   RECAPTURE.

14   Q.   OKAY.  PUTTING IT IN YOUR OWN WORDS, WHAT DO YOU MEAN BY

15   "RECAPTURE"?

16   A.   MY UNDERSTANDING, THE WAY THE TAXES WORK, YOU DEPRECIATE

17   THE PROPERTY OVER THE YEARS.  AND WHEN YOU SELL THE PROPERTY

18   OR IT GOES BACK, THERE IS A PASSIVE GAIN THERE THAT YOU HAVE

19   TO PAY TAX ON THAT GAIN.

20   Q.   DID THAT ULTIMATELY HAPPEN WITH YOU?  DID YOU HAVE A

21   PASSIVE GAIN YOU HAD TO RECOGNIZE?

22   A.   MY UNDERSTANDING IS, YES, I DID.

23   Q.   I WANT TO TALK ABOUT THE PREPARATION OF THE 1065'S, THE

24   PARTNERSHIP TAX RETURNS.

25            BETWEEN YOU AND MR. CORONA DURING THE YEARS '94

1    THROUGH '97, WHO WOULD HAVE BEEN THE PERSON INVOLVED IN THE

2    PREPARATION AND MAKING SURE THAT THE TAX RETURNS WERE

3    PREPARED?

4    A.    THAT WOULD HAVE PROBABLY BEEN MR. CORONA.

5    Q.    DURING '94 TO '97?

6    A.    OH, '94?

7    Q.    YEAH, '94.

8    A.    EXCUSE ME.  I THOUGHT YOU SAID '84.  '94 WOULD PROBABLY

9    HAVE BEEN STEVE MARTIN, MY C.P.A.

10   Q.    OKAY.  AND WOULD YOU HAVE MET WITH MR. MARTIN?

11   A.    PROBABLY NOT.  WE WOULD HAVE SENT HIM ALL THE BOOKS, AND

12   THEY WERE KEPT BY THE GIRL THAT WORKED FOR ME, ROSEMARY

13   LOCKWOOD.

14   Q.    OKAY.  WAS MR. CORONA THE PERSON INVOLVED, OR WAS IT

15   MORE YOU WHO PROVIDED THE INFORMATION TO STEVE MARTIN?

16   A.    AT THAT POINT, IT WAS MORE ME AND ROSEMARY.

17   Q.    IF YOU CAN LOOK AT -- THERE IS A BINDER IN FRONT OF YOU,

18   TO YOUR RIGHT OR LEFT -- 1-231.  I CAN FIND THE DOCUMENT.

19          WHAT IS THIS DOCUMENT?

20   A.    IT'S A FORM 1065, U.S. PARTNERSHIP RETURN OF INCOME FOR

21   PARK CENTRE PROPERTIES.

22          MR. CROWLEY:  WHAT NUMBER, COUNSEL?

23          MR. MAIETTA:  1-231, PAGE 2.

24   Q.    LOOKING THROUGH HERE, CAN YOU LOOK THROUGH HERE AND FIND

25   A K-1 THAT WAS ISSUED TO YOU OR YOUR CORPORATION?

651

1   A.   YES.  I SEE A K-1 FOR JOHN N BLAKE, INC.

2   Q.   AND YOU ALSO SEE A K-1 FOR RICHARD D. CORONA?

3   A.   YES.

4   Q.   AND THIS IS THE 1994 TAX YEAR?

5   A.   YES.

6   Q.   ON THE SECOND PAGE OF 1-231, IS THAT YOUR SIGNATURE?

7   A.   IT APPEARS TO BE, YES.

8   Q.   GOING TO 1-232, WHAT IS THAT FIRST PAGE?

9   A.   IT LOOKS LIKE A 1995 PARTNERSHIP RETURN.

10  Q.   FOR PARK CENTRE PROPERTIES?

11  A.   YES.

12  Q.   AND IS YOUR SIGNATURE ON THE BOTTOM?

13  A.   YES.

14  Q.   LOOKING AT PAGE 6 OF 1-232, WHO IS THE PARTNER ON

15  THAT?

16  A.   JOHN N BLAKE, INC.

17  Q.   IS THAT YOU OR YOUR CORPORATION?

18  A.   THAT'S MY CORPORATION, YES.

19  Q.   AND 1-232, PAGE 8, THE PARTNER IN PARK CENTRE

20  PROPERTIES, WHO IS THAT?

21  A.   RICHARD CORONA.

22  Q.   HIMSELF, NOT ANYTHING ELSE; IS THAT RIGHT?

23  A.   IT SAYS, RICHARD D. CORONA.

24  Q.   THANK YOU.  NEXT ONE IS 1-233, PAGE 2.

25       IS THAT A 1065 FOR PARK CENTRE PROPERTIES?

652

1    A.    YES.  FOR 1996.

2    Q.    OKAY.  YOUR SIGNATURE APPEARS ON THE BOTTOM?

3    A.    YES, IT DOES.

4    Q.    LOOKING AT 1-233, PAGE 7.  IS YOUR CORPORATION,

5    JOHN N BLAKE, INC., REPORTED AS A PARTNER?

6    A.    YES.

7    Q.    1-233, PAGE 9.  IS MR. CORONA LISTED AS THE PARTNER?

8    A.    YES.

9    Q.    AND THIS IS THE 1996 TAX RETURN; RIGHT?

10   A.    YES.

11   Q.    AND THAT'S A K-1 WE'RE LOOKING AT?

12   A.    YES.

13   Q.    THANK YOU.

14         FINALLY, 1997 1065 FOR PARK CENTRE PROPERTIES; IS

15   THAT WHAT THAT SAYS?

16   A.    YES.

17   Q.    AND YOUR SIGNATURE ON THE BOTTOM?

18   A.    YES.

19   Q.    IS YOUR CORPORATION, JOHN N BLAKE, INC., IDENTIFIED AS

20   THE PARTNER?

21   A.    YES.

22   Q.    WHAT IS THE NAME OF THE PARTNER IN THE K-1, 1-234,

23   PAGE 8?

24   A.    CORONA IRREVOCABLE TRUST.

25   Q.    AND WHEN WAS THE FIRST TIME YOU LEARNED ABOUT THE CORONA

1    IRREVOCABLE TRUST, IF YOU CAN RECALL?

2    A.   I DON'T RECALL EXACTLY.  SOMETIME IN THAT TIME FRAME.

3    Q.   AROUND 1997?

4    A.   TO THE BEST OF MY RECOLLECTION, IT WAS ABOUT THE TIME

5    THAT WE WERE WRAPPING UP THE BUSINESS AND THE PROPERTY WAS

6    GOING BACK TO THE LENDER.

7    Q.   AND WHEN WOULD THAT HAVE BEEN, IN 1997?

8    A.   I'M SURE THERE ARE DOCUMENTS THAT SHOW WHEN IT WAS, BUT

9    IT WAS SOMETIME IN THE MID '90S.

10   Q.   OKAY.  WELL, THE MID '90S, OR WHEN YOU WERE WRAPPING UP

11   IN 1997?

12        MAYBE IF I SHOW YOU SOME DOCUMENTS, IT WILL HELP YOU

13   REFRESH YOUR MEMORY.

14   A.   YES, PLEASE.

15   Q.   OKAY.  I CAN DO THAT.

16        LOOKING AT 5-14, 5-15 AND 16.  DO YOU RECOGNIZE

17   THOSE DOCUMENTS?

18   A.   YES, I DO.

19   Q.   AND WHAT ARE EACH OF THOSE DOCUMENTS?

20   A.   THE ONE I'M LOOKING AT IS THE AMENDMENT STATEMENT OF

21   PARTNERSHIP -- AMENDED STATEMENT OF PARTNERSHIP, STATING THAT

22   I, ACTING ALONE, MAY CONVEY TITLE OF ANY REAL PROPERTY HELD

23   IN THE PARTNERSHIP NAME.

24   Q.   WHAT IS THE DATE IN THE UPPER RIGHT-HAND CORNER?

25   A.   IT'S RECORDED NOVEMBER 14TH, 1997.

1    Q.   DOES THIS KIND OF -- DOES THIS REFRESH YOUR RECOLLECTION

2    AS TO THE TIME PERIOD OF WHEN YOU FIRST LEARNED ABOUT

3    MR. CORONA TRANSFERRING HIS INTEREST TO PARK CENTRE -- THE

4    CORONA IRREVOCABLE TRUST?

5    A.   THAT'S THE DATE OF THIS DOCUMENT.  WHETHER OR NOT HE HAD

6    MENTIONED IT TO ME EARLIER, THAT HE WAS GOING TO DO IT OR HAD

7    DONE IT, I DON'T REMEMBER.

8    Q.   LOOKING AT THE TAX RETURN IN 1994 -- WE JUST LOOKED AT

9    THAT BEFORE -- IT IDENTIFIES YOU AND MR. CORONA -- WELL, YOUR

10   CORPORATION AND MR. CORONA AS THE PARTNER; IS THAT RIGHT?

11   A.   THAT'S CORRECT.

12   Q.   SO IN 1994, WAS CORONA IRREVOCABLE TRUST IN THE

13   PARTNERSHIP?

14   A.   NOT ACCORDING TO THOSE DOCUMENTS, IT WAS NOT.

15   Q.   AND YOUR MEMORY?

16   A.   IN MY MEMORY, IT WAS NOT.

17   Q.   IN 1995?

18   A.   SAME.  UNTIL 1997.

19   Q.   OKAY.  NOW, DID THERE COME A TIME WHEN YOU CONSULTED

20   WITH ANYBODY AS A RESULT OF LEARNING ABOUT THIS CHANGE IN THE

21   PARTNERSHIP?  WHEN MR. CORONA HAD SAID HE HAD TRANSFERRED IT

22   TO THE CORONA IRREVOCABLE TRUST, DID YOU CONSULT ANYBODY?

23   A.   YES.

24   Q.   AND WHO DID YOU SPEAK TO?

25   A.   I CALLED MY C.P.A., STEVE MARTIN, AND MY TAX ATTORNEY,

1    GARY ARMSTRONG.

2    Q.    WHY DID YOU DO THAT?

3    A.    WELL, AT THAT TIME, I KNEW THE PARTNERSHIP WAS GOING TO

4    BE WRAPPING UP, AND I WANTED TO MAKE SURE THAT EVERYTHING I

5    DID WAS PROPER.

6    Q.    AS A RESULT OF LEARNING -- OR DISCUSSING WITH

7    MR. ARMSTRONG AND MR. MARTIN, DID YOU AGREE TO SIGN THE

8    PARTNERSHIP OR AMENDED STATEMENT OF PARTNERSHIP?

9    A.    YES.

10   Q.    IF YOU LOOK AT 5-14 AND 5-15 AND 5-16, AT THE VERY

11   BOTTOM OF EACH DOCUMENT THERE IS A DATE.  CAN YOU PLEASE

12   IDENTIFY WHEN THE DATE OF THE EXECUTION OF THIS DOCUMENT TOOK

13   PLACE.

14   A.    OCTOBER 21ST, 1997.

15        MR. MAIETTA:  OKAY.  DURING THE TIME -- ACTUALLY,

16   YOUR HONOR, WE MOVE FOR THE ADMISSION OF 5-14, 5-15 AND 5-16

17   INTO EVIDENCE.

18        MR. CROWLEY:  NO OBJECTION.

19        MS. DOBRO:  NO OBJECTION.  AND I'LL NOTE THAT 5-16

20   IS DEFENSE K, ALREADY ADMITTED.

21        THE COURT:  MR. MAIETTA.

22        MR. MAIETTA:  I'M SORRY, YOUR HONOR.

23        THE COURT:  IT APPEARS -- THAT'S OKAY.  IT'S ALL

24   RIGHT.

25        IT APPEARS THAT 5-16 IS THE SAME AS DEFENDANTS'

1    EXHIBIT K.  AND I DON'T SEE ANY POINT IN HAVING DUPLICATE

2    DOCUMENTS IN THE RECORD.

3            MR. MAIETTA:  OKAY.

4            THE COURT:  SO I'LL ADMIT 5-14 AND 5-15, BUT NOT

5    5-16.  OKAY.

6            MR. MAIETTA:  OKAY.

7            THE COURT:  EVERYBODY AGREE?

8            MR. CROWLEY:  AGREED.

9            MR. MAIETTA:  AGREED.

10           MS. DOBRO:  AGREED.

11           THE COURT:  OKAY.

12       (GOVERNMENT'S EXHIBITS 5-14 AND 5-15 RECEIVED IN

13   EVIDENCE.)

14           MR. MAIETTA:  THANK YOU.

15   Q.   DURING THE TIME OF THE YEARS '94, '95, '96 AND '97,

16   MR. SELBY, DID MR. CORONA EVER HAVE ANY CONVERSATIONS WITH

17   YOU ABOUT HIM NOT PAYING HIS INCOME TAXES?

18   A.   I DON'T THINK SO.

19   Q.   DID HE EVER COMPLAIN TO YOU THAT HE DIDN'T LIKE PAYING

20   HIS INCOME TAXES?

21   A.   I DON'T THINK SO.

22   Q.   DID HE EVER TELL YOU THAT THE I.R.S. WAS TRYING TO

23   COLLECT HIS BACK TAXES?

24   A.   DURING THE PERIOD OF '94 TO '97?

25   Q.   OR '98, YEAH.

1    A.    I DON'T BELIEVE SO.

2    Q.    DID HE EVER TELL YOU DURING THOSE YEARS -- '94, '95,

3    '96, '97, AND EVEN IN '98 AND '99 -- THAT HE BELIEVED HE WAS

4    A NONRESIDENT ALIEN AND DIDN'T HAVE TO PAY HIS TAXES?

5    A.    NO.

6    Q.    DID HE EVER APPROACH YOU WITH SOME TYPE OF THEORY AND

7    TELL YOU ABOUT IT?

8    A.    NO.

9    Q.    ABOUT BEING A NONRESIDENT ALIEN?

10   A.    NO.

11          MR. MAIETTA:  NO FURTHER QUESTIONS, YOUR HONOR.

12          THE COURT:  ALL RIGHT.  WHO IS NEXT?  MR. CROWLEY,

13   MS. DOBRO?

14          MS. DOBRO:  MR. CROWLEY WILL BE NEXT.  THANK YOU.

15          THE COURT:  OKAY.

16                      CROSS-EXAMINATION

17   BY MR. CROWLEY:

18   Q.    GOOD AFTERNOON, MR. SELBY.

19   A.    GOOD AFTERNOON.

20   Q.    I THINK I JUST WANT TO CLEAR UP ONE POINT.  YOU SAID

21   THAT YOU THOUGHT THAT -- YOU DIDN'T THINK THAT THE TRUST WAS

22   THE PARTNER THAT YOU WERE DEALING WITH DURING THE YEARS OF

23   '95, '96.

24          DID YOU -- IS IT FAIR TO SAY THAT YOU AND MR. CORONA

25   DIDN'T HAVE MANY, OR PERHAPS NO CONVERSATIONS ABOUT THE

658

1  PARTICULAR PARTNERSHIP AND THE NUTS AND BOLTS OF THE

2  PARTNERSHIP DURING THAT PERIOD?

3  A.   THAT'S FAIR TO SAY.

4  Q.   OKAY.  AND, IN FACT, YOU EVEN TRANSFERRED YOUR

5  PARTNERSHIP INTEREST TO THE CORPORATION IN APPROXIMATELY

6  1994.

7       DO YOU REMEMBER THAT?

8  A.   YES.  ONE OF THESE DOCUMENTS.  I THINK IT WAS '93.

9  Q.   '93.  OKAY.  1993.

10      AND YOU DIDN'T HAVE ANY KIND OF SUBSTANTIVE

11  CONVERSATION WITH MR. CORONA CONCERNING THAT; IS THAT FAIR TO

12  SAY?

13  A.   I DON'T REMEMBER HAVING A CONVERSATION WITH HIM ABOUT

14  IT.  IT'S SOMETHING THAT WAS DONE BETWEEN MY C.P.A., MY

15  C.F.O., AND MY TAX ATTORNEY.

16  Q.   OKAY.  AT THEIR RECOMMENDATION?

17  A.   YES.

18  Q.   ALL RIGHT.  AND SO THE TRANSFER, YOUR TRANSFER TO THE

19  CORPORATION, WHICH IS ALSO INCLUDED IN THAT AMENDED

20  PARTNERSHIP AGREEMENT IN 1997, AND MR. CORONA'S TRANSFER TO

21  THE TRUST, WAS CLEANING UP, BASICALLY CLEANING UP ALL THOSE

22  ISSUES AS FAR AS THE PARTNERSHIP WAS CONCERNED; IS THAT FAIR

23  TO SAY?

24  A.   YES.

25      MR. CROWLEY:  THANK YOU.  NOTHING FURTHER.

659

1             THE COURT:  MS. DOBRO?

2             MS. DOBRO:  I HAVE NO QUESTIONS OF THIS WITNESS.

3        THANK YOU.

4             THE COURT:  REDIRECT?

5             MR. MAIETTA:  YES, YOUR HONOR.

6                    REDIRECT EXAMINATION

7    BY MR. MAIETTA:

8    Q.   MR. CROWLEY HAD ASKED YOU SOME QUESTIONS ABOUT THE FACT

9    THAT YOUR CORPORATION IS LISTED ON THE PARTNERSHIP, OR AT

10   LEAST ON THE PARTNERSHIP AMENDMENT STATEMENT.

11             DO YOU REMEMBER THAT QUESTION?  OR IS MY QUESTION

12   CONFUSING?

13   A.   I THOUGHT YOU ASKED ME THAT QUESTION.  BUT WHATEVER.

14   YES.

15   Q.   OKAY.  HE HAD ASKED YOU IF YOU HAD TRANSFERRED YOUR

16   INTEREST TO YOUR CORPORATION.

17   A.   YES.

18   Q.   OKAY.  DID YOU REPORT THAT ON THE PARK CENTRE PROPERTY

19   TAX RETURNS?

20   A.   YES.

21   Q.   WHO WAS THE PARTNER LISTED ON THE PARK CENTRE PROPERTY

22   TAX RETURNS?

23   A.   AFTER '93, IT WOULD HAVE BEEN JOHN N BLAKE, INC., MY

24   CORPORATION.

25   Q.   OKAY.  SO YOU SHOWED IT ON THE TAX RETURNS, WHO WAS THE

1    PARTNER IN THE PARTNERSHIP?

2    A.   YES.  I SIGNED THE TAX RETURNS.  THEY WERE PREPARED BY

3    MY ACCOUNTANTS.

4    Q.   OKAY.  WHERE WAS YOUR LOCATED OFFICE, OR DID YOU HAVE AN

5    OFFICE IN THE CORONA LAW FIRM?

6    A.   AT THAT TIME, I DID, YES.

7    Q.   AND FOR HOW MANY YEARS?

8    A.   PROBABLY FROM ABOUT 1994 TO 2000.

9    Q.   OKAY.  SO YOU HAD CLOSE CONTACT WITH MR. CORONA, OR NOT

10   CLOSE, BUT YOU SAW HIM ON A REGULAR BASIS?

11   A.   NOT REGULAR.  HE WAS USUALLY IN HIS OFFICE DOING HIS

12   LEGAL STUFF OR IN COURT.  MY OFFICE WAS THERE.  I MIGHT SEE

13   HIM A COUPLE TIMES A MONTH.

14             MR. MAIETTA:  OKAY.  THANK YOU.

15             NO FURTHER QUESTIONS.

16             MR. CROWLEY:  NOTHING FURTHER, YOUR HONOR.

17             THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

18             MR. MAIETTA, PLEASE CALL YOUR NEXT WITNESS.

19             MR. MAIETTA:  UNITED STATES CALLS JOEL EWAN TO THE

20   WITNESS STAND.

21             THE COURT:  ALL RIGHT.

22             THE CLERK:  RAISE YOUR RIGHT HAND.

23        JOEL EWAN, A GOVERNMENT WITNESS, HAVING BEEN DULY SWORN,

24   TESTIFIED AS FOLLOWS:

25             THE CLERK:  PLEASE BE SEATED.

1     STATE YOUR FULL NAME FOR THE RECORD, SPELLING BOTH

2   YOUR FIRST AND LAST NAME.

3        THE WITNESS:  JOEL E. EWAN.  J-O-E-L.  LAST NAME

4   E-W-A-N.

5                   DIRECT EXAMINATION

6   BY MR. MAIETTA:

7   Q.   GOOD AFTERNOON, MR. EWAN.

8   A.   GOOD AFTERNOON.

9   Q.   WHERE DO YOU WORK?

10   A.   CALIFORNIA BANK & TRUST.

11   Q.   AND HOW LONG HAVE YOU WORKED THERE FOR?

12   A.   I'VE WORKED THERE FOR 14 YEARS, INCLUDING THE

13   PREDECESSOR BANK, GROSSMONT BANK.

14   Q.   WHAT IS YOUR CURRENT POSITION?

15   A.   I AM THE CREDIT ADMINISTRATOR FOR THE SAN DIEGO

16   REGION.

17   Q.   AND IN THAT POSITION, WHAT ARE SOME OF YOUR DUTIES?

18   A.   TO APPROVE, STRUCTURE AND COLLECT LOANS.

19   Q.   NOW, BACK IN 1997, YOU SAID YOU HAD WORKED THERE FOR

20   ABOUT 14 YEARS, AT CALIFORNIA BANK & TRUST'S PREDECESSOR,

21   GROSSMONT BANK?

22   A.   CORRECT.

23   Q.   WHAT WAS YOUR POSITION AT GROSSMONT BANK?  WAS IT

24   GROSSMONT BANK AT THE TIME?

25   A.   YES, IT WAS.

1    Q.    WHAT WAS YOUR POSITION AT THE BANK?

2    A.    I WAS A SPECIAL ASSET OFFICER, AS WELL AS THE CREDIT

3    ADMINISTRATOR FOR GROSSMONT.

4    Q.    WHAT IS A SPECIAL ASSET -- WHAT WAS THAT POSITION?

5    A.    SPECIAL ASSET IS OUR EUPHEMISM FOR PROBLEM LOANS.

6    Q.    AND THE OTHER POSITION YOU HELD?

7    A.    WAS THE CREDIT ADMINISTRATOR POSITION.

8    Q.    AND WHAT WAS THAT POSITION?

9    A.    IT'S THE SAME THING AS I DO CURRENTLY, WHICH IS TO

10   APPROVE STRUCTURE AND PUT TOGETHER LOANS.

11   Q.    OKAY.  DO YOU KNOW A PERSON BY THE NAME OF RICHARD

12   CORONA?

13   A.    YES.

14   Q.    AND HOW DO YOU KNOW HIM?

15   A.    MR. CORONA WAS A BORROWER OF OURS AT GROSSMONT BANK.

16   Q.    WAS HE A BORROWER FOR INDIVIDUAL OR BUSINESS RELATED --

17   A.    HE WAS A BORROWER -- AS I BELIEVE THE RECORDS SHOW, HE

18   WAS A BORROWER AS A LAW FIRM.  I THINK IT WAS CORONA &

19   BALESTRERI, LP.

20   Q.    DO YOU RECALL HOW MANY LOANS MR. CORONA HAD?

21   A.    WE HAD A LINE OF CREDIT, WE HAD A TERM LOAN FOR TENANT

22   IMPROVEMENTS AND FOR EQUIPMENT, AND WE HAD A LITTLE AUTO

23   LOAN.

24   Q.    CAN YOU ESTIMATE AND RECALL THE AMOUNT OF THE -- YOU

25   SAID LINE OF CREDIT.  IS THAT LIKE A REVOLVING --

1    A.    REVOLVING LINE OF CREDIT, YES, SIR.

2    Q.    AND HOW MUCH WAS THAT?

3    A.    THAT WAS $150,000.

4    Q.    THE EQUIPMENT LOAN?

5    A.    THE TERM LOAN WAS ABOUT 80,000.

6    Q.    AND WHO DID YOU LOOK TO TO GUARANTY THOSE LOANS?  YOU

7    HAD MENTIONED IT WAS THROUGH THE LAW FIRM.  WHO DID YOU LOOK

8    TO TO GUARANTY THAT?

9    A.    LOOKED TO MR. CORONA TO GUARANTY IT.

10   Q.    DO YOU SEE MR. CORONA IN THE COURTROOM HERE TODAY?

11   A.    YOU KNOW, IT'S BEEN SUCH A LONG TIME.  I THINK THAT

12   MR. CORONA IS SITTING OVER ON THE LEFT-HAND SIDE, BUT I

13   HAVEN'T SEEN HIM IN TEN YEARS.

14   Q.    OKAY.  THAT'S FAIR.

15         AS PART OF -- YOU SAID MR. CORONA HAD THREE LOANS?

16   A.    UH-HUH.

17   Q.    IS IT PART OF THE BANK'S PROCESS TO REVIEW LOANS ON AN

18   ANNUAL BASIS?

19   A.    YES.

20   Q.    AND WHAT ARE THOSE -- WHAT TYPE OF DOCUMENTS ARE

21   GENERATED IN REGARD TO THE REVIEW OF A LOAN?

22   A.    FINANCIAL STATEMENTS OF THE COMPANY INVOLVED, PERSONAL

23   FINANCIAL STATEMENT OF THE GUARANTOR, AS WELL AS A REVIEW OF

24   THE GUARANTOR'S PERSONAL FINANCIAL CREDIT HISTORY THROUGH

25   TRW.

664

1    Q.   DOES THE BANK GENERATE ITS OWN INTERNAL DOCUMENT

2    CONCERNING ITS INTERPRETATION OF THOSE, THAT INFORMATION YOU

3    JUST DESCRIBED?

4    A.   WELL, WE PUT TOGETHER A CREDIT PRESENTATION FOR

5    APPROVAL, YES.

6    Q.   IS THAT --

7    A.   AND WE ANALYZE THE DATA AND MAKE -- OPINE ON IT.

8    Q.   OKAY.  IS THAT CALLED A CREDIT MEMORANDUM?

9    A.   YES, SIR.

10   Q.   I HAVE AN EXHIBIT HERE, EXHIBIT BINDER.  IF YOU COULD

11   TURN TO 8-3.  I'LL JUST ASK IF YOU CAN IDENTIFY EXHIBITS 8-3

12   AND WHAT THEY ARE, TELL US WHAT THEY ARE.

13   A.   THIS IS A CREDIT MEMORANDUM PREPARED IN MARCH OF 1996,

14   REQUESTING A REVOLVING LINE OF CREDIT FOR THE BORROWER,

15   CORONA, BALESTRERI & RAMSEYER, CALIFORNIA PARTNERSHIP,

16   GUARANTEED BY RICHARD CORONA.

17   Q.   OKAY.  LET ME DO AN EXCHANGE HERE.  I THINK THAT HAS

18   SOME HANDWRITING ON THERE.  I'D JUST RATHER HAVE YOU REFER TO

19   SOMETHING FRESH.

20   A.   OKAY.

21   Q.   THANKS.

22        THE DOCUMENTS AFTER THAT, WHAT ARE THOSE?

23   A.   EXHIBIT 8.3B?

24   Q.   YES, SIR.

25   A.   THAT WAS A REQUEST FOR A TERM LOAN TO PROVIDE FINANCING

665

1    FOR TENANT IMPROVEMENTS AND FOR THE PURCHASE OF SOME

2    UNDESCRIBED OFFICE EQUIPMENT.  AND IT WAS ALSO TO THE SAME

3    BORROWER, ALTHOUGH THE BORROWER NAME AT THIS POINT IS

4    CORONA & BALESTRERI.

5    Q.    OKAY.  IF YOU'LL TURN TO -- THERE SHOULD BE ANOTHER

6    EXHIBIT, NO. 8-3C.

7    A.    YES.

8    Q.    AND WHAT IS THAT?

9    A.    THIS WOULD BE THE ANNUAL RENEWAL FOR THE REVOLVING LINE

10   OF CREDIT FOR $150,000.

11   Q.    OKAY.  AND EXHIBIT 8-3D, AS IN DOG.

12   A.    THIS WAS A CREDIT MEMO FOR THE PURCHASE OF AN

13   AUTOMOBILE.  I THINK IT WAS A $12,000 AUTOMOBILE.  A SATURN,

14   I THINK.

15   Q.    OKAY.  AND WERE THESE -- THESE ARE ALL CREDIT

16   MEMORANDUMS?

17   A.    YES, THEY ARE.

18   Q.    AND THESE ARE ALL GENERATED AND KEPT BY THE BANK IN ITS

19   REGULAR COURSE OF BUSINESS?

20   A.    YES.

21   Q.    IF YOU LOOK AT 8-3E, ALSO AT THE VERY LAST PAGE, WHAT IS

22   THAT?

23   A.    THIS IS A CHANGE-IN-RISK RATE, WHICH MEANS THAT WE HAD

24   DETERMINED THAT THERE WERE SOME ISSUES WITH RESPECT TO THE

25   CREDIT.

666

1  Q.   OKAY.  IS THAT ALSO KEPT IN THE REGULAR COURSE OF

2  BUSINESS?

3  A.   YES.

4       MR. MAIETTA:  YOUR HONOR, WE MOVE FOR THE ADMISSION

5  OF 8-3A THROUGH 8-3E INTO EVIDENCE.

6       THE COURT:  ANY OBJECTION?

7       MR. CROWLEY:  8-3, YOU SAID?

8       MR. MAIETTA:  YEAH, 8-3.

9       MR. CROWLEY:  RELEVANCE, YOUR HONOR.

10      THE COURT:  OKAY.  I'M SORRY.  WHAT'S THE EXHIBIT

11 NUMBER?

12      MR. MAIETTA:  8-3.

13      THE COURT:  SUSTAINED.

14      MR. MAIETTA:  CAN WE BE HEARD ON THAT AT A LATER

15 POINT, YOUR HONOR?

16      THE COURT:  ALL RIGHT.

17      MR. MAIETTA:  I GUESS NOT NOW.

18      THE COURT:  NOT NOW.

19 Q.   BY MR. MAIETTA:  MR. EWAN, WHAT TYPE OF INFORMATION IS

20 INCLUDED IN THE MEMORANDUM, CREDIT MEMORANDUMS THAT ARE

21 GENERATED, AND WHY WOULD IT HAVE BEEN CREATED?

22 A.   IT WOULD HAVE BEEN CREATED TO DETERMINE WHETHER OR NOT

23 THE CREDIT REQUESTED WAS A VIABLE CREDIT, IN TERMS OF THE

24 BANK'S POLICY AND THE BANK'S UNDERWRITING STANDARDS; SO THAT

25 WE WOULD DETERMINE WHETHER OR NOT THE LOAN COULD BE ACTUALLY

667

1    GRANTED.

2    Q.   AND THE INFORMATION THAT'S GENERATED OR INCLUDED IN THIS

3    MEMORANDUM, IS IT -- DOES IT COME FROM THE BORROWER?

4    A.   WELL, MOST OF IT DOES, YES.  MOST OF IT IS PROVIDED BY

5    THE BORROWER, IN TERMS OF FINANCIAL STATEMENTS, BOTH THE

6    PERSONAL FINANCIAL STATEMENTS AND THE FINANCIAL STATEMENTS OF

7    THE BUSINESS.  THE TRW INFORMATION, OF COURSE, IS THIRD-PARTY

8    PROVIDER.

9    Q.   OKAY.  DID THERE COME A POINT IN TIME IN APRIL, AROUND

10   APRIL OF 1998, THE BANK BECAME CONCERNED ABOUT MR. CORONA'S

11   CREDIT SITUATION?

12   A.   YES.

13   Q.   AND WHAT WAS THAT ABOUT?

14   A.   WELL, WE HAD RUN A TRW AND FOUND THAT THERE WERE FEDERAL

15   AND STATE TAX LIENS ON THE TRW.

16   Q.   AS A RESULT OF THAT, WHAT HAPPENED?

17   A.   WELL, THE LOAN OFFICER AT THE TIME REQUESTED INFORMATION

18   ABOUT THE LIENS, BECAUSE YOU NEVER KNOW WHETHER THEY ARE

19   CORRECT OR INCORRECT.  IT CAN BE A PROBLEM THAT EXISTS THAT'S

20   A MISUNDERSTANDING, AND IT CAN BE A REAL PROBLEM.

21        IN RESPONSE TO THAT INQUIRY, WE RECEIVED A LETTER

22   BACK WITH NUMEROUS DOCUMENTS SHOWING HIS -- MR. CORONA'S

23   CORRESPONDENCE WITH THE I.R.S.  AT THAT POINT, IT WAS

24   REFERRED TO ME AND TO THE BANK'S COUNSEL.

25        AS WE LOOKED AT IT, WE DEEMED IT TO BE A PROBLEM,

668

1    AND WE ASKED FOR A MEETING WITH MR. CORONA.

2    Q.   HOW LARGE WERE THOSE TAX LIENS?  WERE THEY FEDERAL AND

3    STATE OR JUST --

4    A.   I THINK THE STATE WAS ABOUT 100-PLUS.  THE FEDERAL TAX

5    WAS 400-PLUS.

6    Q.   WHO WAS THE BANK EMPLOYEE THAT FIRST FOUND -- PULLED THE

7    CREDIT REPORT?

8    A.   WELL, THE ACTUAL CREDIT REPORT WOULD HAVE BEEN PULLED BY

9    ONE OF THE CLERKS, BUT THE LOAN OFFICER INVOLVED WAS GARY

10   CADY.

11   Q.   YOU HAD MENTIONED THAT MR. CORONA HAD PROVIDED THE BANK,

12   MR. CADY, SOME DOCUMENTS; IS THAT CORRECT?

13   A.   WELL, YOU KNOW, HE WAS PROVIDING, ON A ROUTINE BASIS,

14   HIS PERSONAL FINANCIAL STATEMENTS AND THE FINANCIAL

15   STATEMENTS OF THE BUSINESS.

16   Q.   OKAY.  CAN YOU LOOK AT 8-2.  BECAUSE YOU SAID THERE WERE

17   SOME DOCUMENTS MR. CORONA PROVIDED THAT YOU EVENTUALLY

18   RECEIVED.

19   A.   OH, OKAY.  YOU MEAN THE LETTER?

20   Q.   YES.

21   A.   ON JUNE 8TH.  YES, TO MR. CADY.

22   Q.   DO YOU RECOGNIZE THAT LETTER?

23   A.   YES, I DO.

24   Q.   AND WHAT IS IT?

25   A.   IT'S A LETTER FROM MR. CORONA, ATTACHING THREE LETTERS

1    FROM THE -- WELL, TWO LETTERS FROM THE I.R.S. AND HIS

2    RESPONSE TO THOSE LETTERS.

3              MR. MAIETTA:  YOUR HONOR, WE MOVE THE ADMISSION OF

4    8-2 INTO EVIDENCE.

5              THE COURT:  ANY OBJECTION?

6              MR. CROWLEY:  JUST A MOMENT, YOUR HONOR.

7              NO OBJECTION, YOUR HONOR.

8              MS. DOBRO:  NO OBJECTION.

9              THE COURT:  ALL RIGHT.  IT WILL COME IN.

10             MR. MAIETTA:  THANK YOU, YOUR HONOR.

11        (GOVERNMENT'S EXHIBIT 8-2 RECEIVED IN EVIDENCE.)

12   Q.  BY MR. MAIETTA:  MR. EWAN, WAS THIS LETTER REFERRED TO

13   YOU BY MR. GARY CADY?

14   A.  YES.

15   Q.  AND, MR. VIGIL, CAN YOU BRING 8-2 UP ONTO THE SCREEN.

16   PAGE 1.

17             MR. EWAN, WHO IS THIS LETTER ADDRESSED TO?

18   A.  IT'S ADDRESSED TO GARY CADY, VICE-PRESIDENT, GROSSMONT

19   BANK.

20   Q.  AND WHO WAS THE LETTER FROM?

21   A.  R.D. CORONA.

22   Q.  LOOKING ON PAGE 2, DOES THAT APPEAR TO BE HIS

23   SIGNATURE?

24   A.  I DON'T KNOW.  YOU KNOW, I'D HAVE TO CHECK OTHER

25   SIGNATURES.  I DON'T KNOW.

670

1    Q.   OKAY.  CAN YOU JUST READ THE FIRST TWO PARAGRAPHS, OR

2    WHAT HE WAS PROVIDING TO YOU, AND THEN THE SECOND PARAGRAPH.

3    A.   "PURSUANT TO OUR MEETING OF JUNE 1, 1998, WHEREIN YOU

4    REQUESTED COPIES OF SOME OF THE CORRESPONDENCE I HAVE

5    EXCHANGED WITH THE INTERNAL REVENUE SERVICE, I ENCLOSE THE

6    FOLLOWING:

7         "NO. 1, MY LETTER DATED SEPTEMBER 15, 1997, TO

8    C. ROSE, I.R.S.  NO. 2, LETTER DATED SEPTEMBER 25TH, 1997,

9    FROM C. ROSE.  AND, NO. 3, MY LETTER DATED OCTOBER 15, 1997,

10   IN RESPONSE TO NO. 2 ABOVE.

11        "AS I ADVISED YOU, SINCE MY OCTOBER 15, 1997 LETTER,

12   I HAVE RECEIVED NO FURTHER CORRESPONDENCE FROM THE I.R.S.

13   RESPONDING TO MY CONCERNS.

14        "AT THIS POINT, I AM OF THE BELIEF THAT THE I.R.S.

15   WILL TAKE NO FURTHER ACTION IN THESE MATTERS AGAINST ME AND

16   THE STATUTE OF LIMITATIONS WILL EVENTUALLY RUN."

17   Q.   MR. EWAN, WAS THIS LETTER -- I THINK YOU HAD SAID IT WAS

18   REFERRED TO YOU; IS THAT RIGHT?

19   A.   BY MR. CADY, YES.

20   Q.   DID YOU EVENTUALLY SCHEDULE A MEETING WITH MR. CORONA

21   REGARDING THIS LETTER?

22   A.   WE DID.

23   Q.   AND CAN YOU TELL US WHAT TOOK PLACE AT THAT MEETING?

24   A.   WELL, WE WENT TO -- LET ME SAY THERE WERE TWO OF US THAT

25   WENT.  PEGGY STANDEFER, THE BANK COUNSEL, AND MYSELF MET WITH

671

1    MR. CORONA.  WE EXPRESSED TO HIM OUR BELIEF THAT THE BANK WAS

2    IN A PERILOUS POSITION, BASED ON THESE NEW REVELATION OF TAX

3    LIENS THAT HAD OCCURRED.

4        MR. CORONA BELIEVED THAT WE WEREN'T, THAT HIS

5    PERSONAL AFFAIRS WERE NOT AN ISSUE.  THAT OUR LOAN WAS TO THE

6    COMPANY.

7        OUR RESPONSE BASICALLY WAS THAT WE STILL FELT THAT

8    BEING BETWEEN THE U.S. GOVERNMENT AND MR. CORONA WAS NOT A

9    VERY TENABLE PLACE FOR A BANK TO BE.  WE THEN REQUESTED THAT

10   MR. CORONA REPAY THE LOAN IN ITS ENTIRETY.

11       MR. CORONA SAID HE COULDN'T REPAY IT AT THAT TIME.

12   AND WE SET UP A PAYMENT SCHEDULE, WHICH HE ADHERED TO.

13   Q.   HE ADHERED TO THAT PAYMENT SCHEDULE?

14   A.   HE DID.  WITH ONE OR TWO MUTUALLY AGREED-UPON CHANGES.

15   Q.   NOW, WAS THAT IN REGARD TO THE THREE LOANS YOU TESTIFIED

16   EARLIER ABOUT?

17   A.   IT WAS MOSTLY IN REGARD TO THE ONE FIVE, THE REVOLVING

18   LINE OF CREDIT.  THE OTHER TWO LOANS WERE PAYING ON THEIR

19   NORMAL TERMS AND WERE SECURED BY SPECIFIC ASSETS.

20   Q.   HE PAID THAT LOAN OFF EVENTUALLY?

21   A.   HE EVENTUALLY -- HE EVENTUALLY PAID ALL THE LOANS OFF.

22   Q.   DID YOU CONTINUE TO DO BUSINESS WITH MR. CORONA, THE

23   BANK?

24   A.   ON THE LOAN SIDE, NO.  ON THE DEPOSIT SIDE, I DON'T

25   KNOW.

COMPUTER-AIDED TRANSCRIPTION

1    Q.   OKAY.  GOING BACK TO THAT MEETING, WAS THAT -- WHEN WAS

2    THAT MEETING WITH MR. CORONA, PEGGY STANDEFER AND YOURSELF, A

3    TIME FRAME?

4    A.   I THINK JULY.

5    Q.   JULY '98?

6    A.   YEAH.

7    Q.   AND WHAT DID MR. CORONA TELL YOU ABOUT HIS TAX THEORY?

8    A.   HE DIDN'T BELIEVE THAT THE FEDERAL GOVERNMENT HAD THE

9    AUTHORITY TO TAX INDIVIDUAL INCOME.

10   Q.   OKAY.

11   A.   HE BELIEVED THAT THE STATE, ON THE OTHER HAND, DID.

12   Q.   OKAY.  IN RESPONSE TO THAT, WHAT DID YOU TELL HIM?

13   A.   WE WISHED HIM LUCK, BUT WE BASICALLY SAID THAT WE STILL

14   FELT THAT, REGARDLESS OF HIS PERSONAL FEELING ABOUT THIS, HE

15   WAS PUTTING THE BANK'S LOAN AT RISK, BASED ON THE FACT THAT

16   AT SOME POINT THE FEDERAL GOVERNMENT WAS PROBABLY GOING TO

17   ASK FOR ITS MONEY.

18   Q.   AND IN REGARD TO THE STATE TAXES, HE HAD A STATE TAX

19   LIEN?

20   A.   I HAVE NO ANSWER FOR THAT.  ALTHOUGH HE DID SAY THAT HE

21   BELIEVED THAT STATE WAS A LEGAL TAXING ENTITY.

22   Q.   AND HOW MUCH DID HE OWE ON THE STATE TAXES?

23   A.   IT WAS A HUNDRED THOUSAND PLUS.  I JUST DON'T REMEMBER.

24   THAT WAS WHAT SHOWED UP ON THE TRW.

25   Q.   OKAY.  AFTER THAT MEETING, DID YOU GENERATE ANY DOCUMENT

673

1   OR NOTES AS A RESULT OF THAT?

2   A.   WE GENERATED AN AGREEMENT, A VERY SIMPLE, TWO-PAGE

3   AGREEMENT THAT I SIGNED AND HE SIGNED; AND HE LIVED UP TO THE

4   REPAYMENT OF THAT AGREEMENT.

5   Q.   OKAY.  BUT DURING -- AFTER THAT MEETING -- ACTUALLY,

6   WHERE DID THAT MEETING TAKE PLACE?

7   A.   AT MR. CORONA'S OFFICE.

8   Q.   AND AFTER YOU RETURNED TO YOUR OFFICE, DID YOU GENERATE

9   YOUR OWN MEMORANDUM OF WHAT HAPPENED?

10  A.   YES, I DID.

11  Q.   AND CAN YOU LOOK AT 8-1.

12  A.   8-1?

13  Q.   YES.

14  A.   YES.  I HAVE IT.

15  Q.   WHAT IS THAT?

16  A.   IT WAS SOME NOTES THAT I JOTTED IMMEDIATELY AFTER COMING

17  BACK FROM THE MEETING, JUST SO THAT I COULD REMEMBER SOME OF

18  THE SALIENT POINTS.

19  Q.   AND IN REGARD TO THE TAX RETURNS, OR THE FACT THAT HE

20  WAS NOT PAYING HIS TAXES, WHAT ARE SOME OF THE SALIENT POINTS

21  THAT STAND OUT DURING THAT MEETING?

22  A.   WELL, ONE OF THE INTERESTING POINTS WAS THAT --

23       MR. CROWLEY:  I'M GOING TO OBJECT, YOUR HONOR.  AT

24  LEAST TO CLARIFY WHETHER HE'S TESTIFYING FROM HIS

25  RECOLLECTION OR JUST GOING TO READ FROM THIS DOCUMENT AS TO

1    HIS RECOLLECTION.

2            THE COURT:  THAT'S FAIR ENOUGH.

3            CAN YOU TELL US IF YOU'RE TESTIFYING FROM YOUR

4    RECOLLECTION, OR ARE YOU READING FROM THE DOCUMENT?

5            THE WITNESS:  WELL, I CAN TELL YOU THAT AT LEAST

6    PART OF IT IS FROM RECOLLECTION.

7            THE COURT:  ALL RIGHT.  GO AHEAD.

8            THE WITNESS:  IT'S BEEN TEN YEARS.

9    Q.  BY MR. MAIETTA:  IF YOU NEED TO REFRESH YOUR MEMORY, YOU

10   CAN LOOK AT THE DOCUMENT AND TELL US WHAT YOU REMEMBER.

11   A.  OKAY.  GO AHEAD AND ASK AWAY.

12   Q.  OKAY.  WHAT SALIENT POINTS STAND OUT?

13   A.  WELL, THE ONE POINT THAT WAS INTERESTING TO US WAS THAT

14   MR. CORONA STATED THAT HE FILED AS A NONRESIDENT ALIEN.  AND

15   THAT TO -- HE WAS REQUIRED BY LAW TO FILE A RETURN, AND TO

16   NOT DO SO WAS WILLFUL DISREGARD OF THE LAW.

17           IT STRUCK ME AS BEING INTERESTING IS ALL.

18   Q.  AND HE USED THE WORDS WILLFUL WRONG, OR WORDS --

19   A.  WILLFUL DISREGARD OF THE LAW NOT TO FILE.

20   Q.  AND HE WAS AWARE OF THAT?

21   A.  HE SAID IT, SO...

22   Q.  ANY OTHER SALIENT POINTS FROM THAT CONVERSATION WITH

23   MR. CORONA?

24   A.  WELL, THERE WERE, OF COURSE, DISCUSSIONS ABOUT HIS

25   THEORY, WHICH I DON'T RECALL IN DETAIL, BECAUSE, FRANKLY, I

1    WASN'T THAT INTERESTED IN THAT, IN THE THEORY.  WHAT I WAS

2    VERY INTERESTED IN IS BEING REPAID.

3           CONSEQUENTLY, BECAUSE I FELT THAT THE FEDERAL

4    GOVERNMENT WAS ON THE ONE SIDE AND WE WERE ON THE OTHER, THAT

5    OUR REPAYMENT OF THE LOAN HAD TO BE FORTHWITH.  SO OUR GOAL

6    IN MEETING WITH MR. CORONA WAS TO ESTABLISH EITHER AN

7    IMMEDIATE PAYOFF OR A PAYOFF OVER SOME PERIOD OF TIME

8    MUTUALLY AGREEABLE.

9    Q.   THIS MIGHT BE AN OBVIOUS ANSWER TO THE QUESTION HERE,

10   BECAUSE THE BANK ACTUALLY DOES LOAN TO MR. CORONA MONEY.  HOW

11   DID THE BANK VIEW MR. CORONA BACK IN '96 AND '97 FOR CREDIT

12   WORTHINESS?

13   A.   VERY ACCEPTABLE.

14           MR. MAIETTA:  ONE MOMENT, YOUR HONOR.

15           NO FURTHER QUESTIONS, YOUR HONOR.

16           THE COURT:  MR. CROWLEY?

17                   CROSS-EXAMINATION

18   BY MR. CROWLEY:

19   Q.   GOOD AFTERNOON, MR. EWAN.

20   A.   GOOD AFTERNOON.

21   Q.   DID I PRONOUNCE THAT CORRECTLY?

22   A.   YES, YOU DID.

23   Q.   THANK YOU.

24           WE HAVEN'T MET, HAVE WE?

25   A.   NO, SIR.

676

1    Q.   WE EXCHANGED A FEW VOICE MAIL MESSAGES, DIDN'T WE?

2    A.   YES, WE DID.

3    Q.   AND YOU SAID YOU WERE UNCOMFORTABLE SPEAKING WITH ME,

4    DIDN'T YOU?

5    A.   THAT'S CORRECT.

6    Q.   WAS IT MY TONE OF VOICE OR --

7    A.   NO.  I WAS UNDER SUBPOENA.  I HAD -- I DIDN'T BELIEVE I

8    HAD ANY REASON TO TALK WITH YOU, SO I DID NOT.

9    Q.   OKAY.  FAIR ENOUGH.

10        YOU DID TALK TO THE GOVERNMENT, THOUGH, DIDN'T YOU?

11   A.   YES, SIR.

12   Q.   OKAY.  AND YOU TALKED TO MS. ZARONI; CORRECT?

13   A.   YES, SIR.

14   Q.   AND THERE WAS ANOTHER AGENT THERE ALSO AT THE TIME?

15   A.   AT WHAT MEETING?

16   Q.   OCTOBER 27TH, 1999.

17   A.   THERE WERE TWO PEOPLE.  I DON'T KNOW WHO THE OTHER ONE

18   IS.

19   Q.   OKAY.  I'M SURE THEY IDENTIFIED THEMSELVES.

20   A.   I'M SURE THEY DID.

21   Q.   AND THEY WERE BOTH FROM THE GOVERNMENT?

22   A.   YES, SIR.

23   Q.   OKAY.  AND WHAT I WANT -- I'M SHOWING YOU 8-2.  AND THE

24   GOVERNMENT HAD YOU READ THE FIRST TWO PARAGRAPHS OF

25   MR. CORONA'S LETTER, SO I'D LIKE YOU TO READ THE THIRD

1    PARAGRAPH FOR US.

2    A.    "WHILE I DO NOT EXPECT YOU TO NECESSARILY AGREE WITH OR

3    HAVE THE TIME OR INTEREST TO RESEARCH THE VALIDITY OF MY

4    POSITION, I WANT TO ADVISE YOU THAT THE POSITIONS TAKEN ARE

5    WELL-SUPPORTED BY FAIRLY THOROUGH RESEARCH AND INVESTIGATION.

6         "REGARDLESS, AS I HAVE ADVISED, THIS IS A PERSONAL

7    ISSUE THAT CANNOT LEGALLY IMPAIR THE BANK'S SECURED POSITION

8    WITH THE ASSETS OF CORONA & BALESTRERI, INASMUCH AS IT IS AN

9    ENTITY TWICE REMOVED FROM ME.

10        "THUS, THERE SHOULD BE NO REALISTIC CONCERN THAT MY

11   DISPUTE WITH THE I.R.S. WILL DISABLE THE FIRM FROM HONORING

12   ITS OBLIGATION IN FAVOR OF THE BANK IN ORDINARY RECOURSE."

13   Q.    THANK YOU.

14        IN MEETING WITH MR. CORONA AND DISCUSSING WITH HIM

15   AND GETTING THIS LETTER, THERE WAS NO DOUBT IN YOUR MIND THAT

16   HE BELIEVED WHAT HE WAS SAYING, IS THERE?

17        MR. MAIETTA:   OBJECTION.

18        THE COURT:   SUSTAINED.

19   Q.    BY MR. CROWLEY:   WELL, YOU LISTENED TO MR. CORONA,

20   DIDN'T YOU?

21   A.    YES.

22   Q.    YOU WATCHED WHAT HE WAS TELLING YOU ABOUT THE ARGUMENTS,

23   EVEN THOUGH YOU WEREN'T THAT INTERESTED?

24   A.    YES.

25   Q.    AND HE WAS PASSIONATE ABOUT IT, WASN'T HE?

1    A.    YES.

2    Q.    AND, IN FACT, YOU TOLD THE AGENTS THAT YOUR PERCEPTION

3    WAS THAT HE BELIEVED EXACTLY WHAT HE WAS SAYING, DIDN'T YOU?

4              MR. MAIETTA:  OBJECTION.

5              THE COURT:  OVERRULED.

6    Q.    BY MR. CROWLEY:  YOU CAN ANSWER.

7    A.    YES.

8              MR. CROWLEY:  THANK YOU.  NOTHING FURTHER.

9              THE COURT:  ALL RIGHT.  MS. DOBRO.

10             MS. DOBRO:  NO CROSS.  THANK YOU.

11             THE COURT:  MR. MAIETTA.

12             MR. MAIETTA:  YES, YOUR HONOR.  VERY BRIEFLY.

13                      REDIRECT EXAMINATION

14   BY MR. MAIETTA:

15   Q.    LOOKING AT 8-1 AGAIN.

16             MR. MAIETTA:  WE'D ACTUALLY MOVE FOR THE ADMISSION

17   OF 8-1 INTO EVIDENCE.

18             THE COURT:  ANY OBJECTION?

19             MR. CROWLEY:  YES, YOUR HONOR.

20             THE COURT:  IT WILL COME IN.  IT'S PAST RECOLLECTION

21   RECORDED.

22             MR. CROWLEY:  HAVEN'T USED THAT ONE IN A WHILE.

23   Q.    BY MR. MAIETTA:  LOOKING AT, SINCE WE DIDN'T -- CAN WE

24   BRING 8-1 UP ON THE SCREEN.

25             LOOKING AT WHERE IT READS -- IF YOU CAN HIGHLIGHT

1    THAT, MR. VIGIL -- DOES NOT INTEND TO PAY FEDERAL INCOME

2    TAXES UNTIL HIS QUESTIONS ARE ANSWERED.  FEELS LIKE -- OR

3    FEELS CASE WILL DROP INTO BLACK HOLE.

4         WHAT DO YOU MEAN BY THAT?

5         MR. CROWLEY:  YOUR HONOR, I'M GOING TO OBJECT.  IT

6    EXCEEDS CROSS.

7         THE COURT:  IT DOES EXCEED CROSS.

8         SUSTAINED.

9         MR. MAIETTA:  HE ACTUALLY ASKED ABOUT HIS

10   IMPRESSION.  HE ASKED MR. EWAN ABOUT WHETHER HE WAS

11   PASSIONATE, WHAT YOU THOUGHT DURING THE CONVERSATION AND WHAT

12   TOOK PLACE.  I THINK THAT'S SORT OF IN THE SUBJECT MATTER OF

13   THE MEETING.

14        THE COURT:  SUSTAINED.

15        MR. MAIETTA:  THANK YOU.

16        NO FURTHER QUESTIONS, YOUR HONOR.

17        THE COURT:  YOU MAY STEP DOWN.  THANK YOU.

18        CALL YOUR NEXT WITNESS, PLEASE.

19        MR. MAIETTA:  THE UNITED STATES CALLS CHUCK HELSEL

20   TO THE STAND.

21        THE CLERK:  RAISE YOUR RIGHT HAND.

22       CHUCK HELSEL, A GOVERNMENT WITNESS, HAVING BEEN DULY

23        SWORN, TESTIFIED AS FOLLOWS:

24        THE CLERK:  PLEASE BE SEATED.

25        STATE YOUR FULL NAME, SPELLING YOUR FIRST AND LAST

1    NAME.

2         THE WITNESS:  CHARLES HELSEL, H-E-L-S-E-L.

3         THE COURT:  I TAKE IT YOU'RE A CHARGER FAN?  ALL

4    RIGHT.

5         MR. DICKINSON:  THANK YOU, YOUR HONOR.

6                   DIRECT EXAMINATION

7    BY MR. DICKINSON:

8    Q.   GOOD AFTERNOON, MR. HELSEL.

9    A.   GOOD AFTERNOON.

10   Q.   WHERE DO YOU WORK?

11   A.   FOR CAL PACIFIC MORTGAGE HERE IN SAN DIEGO.

12   Q.   AND HOW LONG HAVE YOU WORKED THERE?

13   A.   I'VE HAD TWO STINTS THERE.  THE LAST FIVE YEARS, AND

14   THEN FOUR YEARS, AND THEN TWO YEARS OFF, AND THEN FOUR YEARS

15   PRIOR TO.

16   Q.   WERE YOU WORKING THERE IN THE FIRST HALF OF 1999?

17   A.   YES.

18   Q.   AND WHAT WERE YOU DOING THERE IN 1999?

19   A.   I ORIGINATE AND CLOSE HOME LOANS.

20   Q.   AND IS THAT STILL WHAT YOU DO?

21   A.   THAT'S WHAT I DO, YES.

22   Q.   AND ARE YOU AN EMPLOYEE OR INDEPENDENT CONTRACTOR?

23   A.   INDEPENDENT CONTRACTOR.

24   Q.   AND, JUST BRIEFLY, WHAT DO YOU DO IN YOUR POSITION?

25   A.   I ASSIST PEOPLE IN GETTING HOME LOANS.

1    Q.    AND WHO DO YOU GET THOSE LOANS WITH?

2    A.    AS A MORTGAGE BROKER, MY JOB IS TO ASSIST MY CLIENTS IN

3    FINDING THE LENDER THAT HAS THE BEST DEAL FOR MY CLIENTS'

4    NEEDS.  A VARIETY OF DIFFERENT LENDERS.

5    Q.    AND IN 1999, WAS MR. RICHARD AND MRS. TRACY CORONA

6    CLIENTS OF YOURS?

7    A.    YES, THEY WERE.

8    Q.    AND WERE YOU ASSISTING THEM IN FINDING A HOME LOAN?

9    A.    YES.

10   Q.    AND THERE IS A BINDER IN FRONT OF YOU.  IF YOU'LL JUST

11   TAKE A LOOK AT 9-1.  IF YOU'LL JUST GLANCE AT THE FIRST FOUR

12   PAGES.

13   A.    OKAY.

14   Q.    DO YOU RECOGNIZE THAT DOCUMENT?

15   A.    YES, I DO.

16   Q.    JUST FOR THE RECORD, IT'S 9-1, AND IT'S 3, 4, 5, 6 AND

17   7.  9-1A, PAGES 3 THROUGH 7.

18          AND WHAT IS THIS DOCUMENT?

19   A.    THIS IS A STANDARD, WHAT'S CALLED A 1003, UNIFORM HOME

20   LOAN, RESIDENTIAL APPLICATION.

21   Q.    AND WHO ARE THE BORROWERS LISTED ON THIS LOAN

22   APPLICATION?

23   A.    IT SAYS RICHARD D. AND TRACY D. CORONA.

24   Q.    AND IF YOU GO TO THE THIRD PAGE, DOWN AT THE BOTTOM.

25   A.    YES.

682

1    Q.   IS THIS SIGNED BY BOTH MR. AND MRS. CORONA?

2    A.   IT LOOKS LIKE IT'S SIGNED BY THEM.

3    Q.   AND IS THIS A DOCUMENT YOU USED IN ASSISTING THEM IN

4    SECURING A HOME LOAN?

5    A.   YES.

6         MR. DICKINSON:  YOUR HONOR, I MOVE FOR THE ADMISSION

7    OF GOVERNMENT'S EXHIBIT 9-1A.

8         MR. CROWLEY:  OBJECT ON RELEVANCE AND 403 GROUNDS,

9    YOUR HONOR.

10        THE COURT:  SUSTAINED -- I'M SORRY.  OVERRULED.

11        MR. DICKINSON:  AND, FOR THE RECORD, THAT'S JUST

12   PAGES 3 THROUGH 7.

13        THE COURT:  YOU'RE TALKING ABOUT BATE STAMPS?

14        MR. DICKINSON:  BATE STAMP PAGES.

15        THE COURT:  .001 THROUGH .007; RIGHT?

16        MR. DICKINSON:  YES.

17        THE COURT:  OKAY.

18        MR. DICKINSON:  PERMISSION TO PUBLISH TO THE JURY,

19   YOUR HONOR?

20        THE COURT:  THEY'LL GET A CHANCE TO SEE IT.

21        ARE YOU TALKING ABOUT PUTTING IT UP THERE?

22        MR. DICKINSON:  YES.

23        THE COURT:  OH, SURE.

24   Q.   BY MR. DICKINSON:  AND WHAT WAS THE PROPERTY, WHAT WAS

25   THE ADDRESS OF THE PROPERTY THE LOAN WAS FOR?

1    A.   AT THE TIME, THEY WERE BUYING 3504 CARAWAY COURT,     EL

2    CAJON, 92109 -- 92019.

3    Q.   AND RIGHT ABOVE THAT, HOW MUCH WAS THE LOAN AMOUNT THAT

4    YOU WERE ASSISTING THEM IN SECURING?

5    A.   THIS LOAN SHOWS THEY APPLIED FOR A LOAN OF $490,000.

6    Q.   AND JUST DOWN BELOW, UNDER MR. CORONA'S NAME, IT LISTS

7    THEIR PRESENT ADDRESS; CORRECT?

8    A.   CORRECT.

9    Q.   DWANE AVENUE?

10   A.   YES.

11   Q.   BELOW THAT, THE CORONA FIRM, LLP?

12   A.   YES.

13   Q.   DID THERE COME A TIME WHEN YOU WERE ASSISTING THE

14   CORONAS THAT YOU DISCOVERED THAT THERE WAS A FEDERAL TAX LIEN

15   ON THE DWANE PROPERTY?

16   A.   WE -- AFTER SPEAKING TO THEM, I RAN THEIR CREDIT.  AND

17   AT THAT POINT, WE SAW A TAX LIEN ON THEIR CREDIT REPORT.  AT

18   THAT POINT, I HAD NO IDEA IF IT'S ON THE PROPERTY OR NOT.

19   Q.   WHEN YOU SAY "WE," DO YOU MEAN CAL PACIFIC MORTGAGE --

20   A.   I DID, YEAH.

21   Q.   -- TO CLARIFY.

22        AND DID THAT POSE A PROBLEM FOR YOU?

23   A.   YES.  WHEN I HAVE PEOPLE APPLYING FOR HOME LOANS AND

24   THEY HAVE FEDERAL TAX LIENS, THE FIRST QUESTION I WOULD ASK,

25   I CALL THEM, TELL THEM -- OR ASK THEM WHAT THE STORY IS WITH

684

1    THAT, AND THEN INDICATE THAT THAT TAX LIEN NEEDS TO BE PAID,

2    BECAUSE LENDERS WILL NOT MAKE HOME LOANS WITH SOMEONE WITH A

3    FEDERAL TAX LIEN WITHOUT SOME MAYBE MODIFIED AGREEMENT OR

4    SOMETHING.

5         BECAUSE THE TAX LIEN WOULD TAKE PRECEDENT AND BE IN

6    FIRST POSITION; THEREFORE, THEY WOULDN'T HAVE COLLATERAL.  SO

7    I'M SURE, AT THE TIME, I SPOKE WITH THE CORONAS REGARDING

8    THIS.

9    Q.   DO YOU REMEMBER TALKING TO MR. AND MRS. CORONA ABOUT

10   THIS, OR WOULD THAT --

11   A.   THIS WOULD BE IN THE NORMAL SCOPE OF MAKING HOME LOANS.

12   THERE WOULD BE A CONVERSATION THAT WE WOULD HAVE ABOUT

13   THAT.

14   Q.   IF YOU COULD TURN A FEW PAGES, IT'S -- THE BOTTOM NUMBER

15   IS .007.  AND DO YOU RECOGNIZE THAT DOCUMENT?

16   A.   YES.  YOU PROVIDED IT TO ME A FEW WEEKS AGO.  YES, I'VE

17   SEEN IT.

18   Q.   DO YOU RECOGNIZE IT OUTSIDE -- WOULD THIS HAVE BEEN

19   SOMETHING THAT YOU WOULD HAVE USED --

20   A.   THIS IS SOMETHING THAT WOULD HAVE BEEN -- THAT IS IN THE

21   LOAN FILE, AND IT WOULD BE A STANDARD LETTER OF EXPLANATION,

22   EXPLAINING ANYTHING THAT WOULD BE NECESSARY TO HELP AN

23   UNDERWRITER MAKE A LOAN DECISION.

24   Q.   AND WHAT IS THIS EXPLAINING?

25   A.   IT --

1    Q.   YOU CAN TAKE A LOOK AT IT.

2           MR. CROWLEY:  YOUR HONOR, THIS IS NOT IN EVIDENCE, I

3    DON'T THINK.

4           MR. DICKINSON:  CAN YOU TAKE IT OFF THE SCREEN.

5           THE WITNESS:  JUST A SECOND.  THERE SEEMS TO BE SOME

6    PROBLEM.

7           MR. DICKINSON:  I DON'T THINK IT'S A PROBLEM NOW.

8    IT'S NOT IN EVIDENCE.  I'M LAYING THE FOUNDATION.

9           THE COURT:  OKAY.  LADIES AND GENTLEMEN, YOU'RE

10   INSTRUCTED TO DISREGARD ANYTHING THAT YOU MAY HAVE SEEN UP

11   THERE.

12          THE WITNESS:  OKAY.  SO IT'S TO WHOM IT MAY CONCERN.

13   THE FIRST THING IS AN EXPLANATION --

14          MR. DICKINSON:  EXCUSE ME.  I APOLOGIZE.

15   Q.   JUST GENERALLY WHAT DOES THIS --

16   A.   IT'S A LETTER OF EXPLANATION.  AND, ONE, IT EXPLAINS THE

17   TAX LIENS.

18   Q.   THE TAX LIENS I JUST ASKED YOU ABOUT?

19   A.   CORRECT.

20   Q.   AND WHAT'S THE DATE ON THIS?

21   A.   THE DATE IS JUNE 30TH, 1999.

22   Q.   AND THE SIGNATURE?

23   A.   THERE IS -- THERE IS A TYPED NAME, RICHARD CORONA, AND

24   THERE IS A SIGNATURE ABOVE IT.

25          MR. DICKINSON:  YOUR HONOR, I MOVE FOR THE ADMISSION

686

1    OF GOVERNMENT EXHIBIT 9-1A, PAGE 17.

2              THE COURT:  OKAY.  ANY OBJECTION?

3              MR. CROWLEY:  I'M GOING TO -- YES, YOUR HONOR.  I'M

4    GOING TO OBJECT ON RELEVANCY AND 403 GROUNDS.

5              THE COURT:  OKAY.  JUST A SECOND.

6              IT'S 9-1 WHAT'S THE NUMBER, COUNSEL.

7              MR. DICKINSON:  .07, YOUR HONOR.  JUNE 30TH, 1999.

8              THE COURT:  9-1.007?

9              MR. DICKINSON:  .017.

10             MR. CROWLEY:  YOUR HONOR, I'LL WITHDRAW THE

11   OBJECTION.

12             THE COURT:  OH, THANK YOU.  THAT MAKES IT EASIER.

13             THE OBJECTION IS OVERRULED.

14             MR. CROWLEY:  THAT WILL TEACH ME.

15             MR. DICKINSON:  VERY GOOD, YOUR HONOR.

16             NOW THAT IT'S IN EVIDENCE, YOUR HONOR, MAY I PUBLISH

17   TO THE JURY?

18             THE COURT:  YES.

19   Q.  BY MR. DICKINSON:  I ASKED YOU -- IT'S JUNE 30TH, 1999.

20   AND MR. CORONA SIGNED THIS.

21             THE COURT:  IS THAT A QUESTION?

22             MR. DICKINSON:  SORRY, YOUR HONOR.

23   Q.  COULD YOU JUST READ THE LAST SENTENCE OF THE FIRST

24   PARAGRAPH.

25   A.  STARTING FROM, I USED THE FUNDS?

1   Q.   YEAH.

2   A.   I USED THE FUNDS FROM THE CONTINGENCY FEE TO PAY THE

3   LINE OF CREDIT OFF AND DELAYED THE PAYMENT OF THE TAXES.

4   Q.   I GUESS THE FIRST SENTENCE AS WELL, PUT THAT INTO

5   CONTEXT.

6   A.   FIRST SENTENCE OF THE PARAGRAPH?

7   Q.   CORRECT.

8   A.   OKAY.  IN 1995, MY LAW FIRM RECEIVED AN EXTRAORDINARY

9   REVENUE OF OVER $800,000 ON A CONTINGENCY FEE CASE.

10  Q.   AND THE PARAGRAPH THAT STARTS "REFINANCE OF OFFICE

11  BUILDING."  WOULD YOU READ THAT?

12  A.   REFINANCE OF OFFICE BUILDING.  THE PROCEEDS OF THE

13  REFINANCE WILL CREATE THE CASH TO PAY OFF TAX LIENS.  THE NEW

14  LOAN WILL HAVE A LOWER INTEREST RATE AND LONGER LOAN TERM.

15  THE NET EFFECT OF THE NEW LOAN WILL BE A NET CASH FLOW

16  INCREASE FROM ME -- TO ME FROM ABOUT 3,000 A MONTH TO

17  APPROXIMATELY 20,000 A MONTH.

18  Q.   AND, AGAIN, THIS LETTER WOULD HAVE BEEN PROVIDED TO THE

19  UNDERWRITER TO EXPLAIN THE FEDERAL TAX LIENS?

20  A.   CORRECT.

21  Q.   WOULD THE FEDERAL TAX LIENS, WOULD THEY HAVE HAD TO HAVE

22  BEEN PAID OFF BEFORE THE LOAN WOULD HAVE BEEN GIVEN, OR DO

23  YOU KNOW?

24  A.   YES.  AGAIN, THE FEDERAL -- THE TAX LIENS WOULD HAVE --

25  THE LENDER WOULD HAVE FELT COMFORTABLE OR CONFIDENT THAT THEY

688

1    HAD BEEN PAID OFF OR SATISFIED.

2    Q.   JUST GOING BACK TO THE FRONT OF THIS 9-1A, JUST FLIP TO

3    THE FIRST PAGE OF THE LOAN.

4    A.   OF THE LOAN APPLICATION?

5    Q.   YES.

6    A.   OKAY.

7    Q.   AND IF YOU COULD TURN TO THE SECOND PAGE OF THAT, WHICH

8    IS PAGE 4 BATES NUMBERED.

9    A.   OKAY.

10   Q.   AND ON THIS APPLICATION, ARE THE BORROWERS -- IN THIS

11   CASE, MR. AND MRS. CORONA -- REQUIRED TO GIVE INCOME

12   INFORMATION?

13   A.   THE ONLY WAY I KNOW FOR A FACT THEY GAVE INCOME

14   DOCUMENTATION IS THAT YOU PROVIDED ME WITH INCOME

15   DOCUMENTATION.  SO THE ANSWER IS I KNOW THAT THERE WAS INCOME

16   DOCUMENTATION IN THE FILE; THEREFORE, THEY PROVIDED INCOME

17   DOCUMENTATION.

18   Q.   OKAY.  BUT MORE GENERAL, MY QUESTION IS, DO YOU KNOW,

19   TYPICALLY ON THESE FORMS -- ON PAGE 2 IT ASKS FOR MONTHLY

20   INCOME ON THIS FORM ON THE TOP.

21   A.   RIGHT.  IT ALWAYS ASKS FOR MONTHLY INCOME.

22   Q.   AND IN THE COURSE OF DOING YOUR JOB WITH ANY CUSTOMER,

23   IN HELPING THEM ASSIST IN THE LOAN, YOU WOULD GATHER THIS

24   INFORMATION?

25   A.   THERE IS THREE MAIN TYPES OF LOANS.  ONE IS A FULL

1    DOCUMENTATION, WHERE A CLIENT PROVIDES INCOME DOCUMENTATION.

2    ONE IS A STATED INCOME LOAN, WHERE THEY WOULD STATE INCOME,

3    SAY, I MAKE 40,000, OR 4,000 A MONTH.  AND THE THIRD ONE

4    WOULD BE NO STATED INCOME, WHERE THERE WOULD BE NO INCOME

5    THERE.

6    Q.   AND CAN YOU TELL WHAT TYPE OF LOAN THIS WAS?

7    A.   AGAIN, BECAUSE I WAS PROVIDED INCOME DOCUMENTATION FROM

8    THE ULTIMATE LENDER, IT HAD TO BE A FULL-INCOME DOCUMENTATION

9    LOAN.

10   Q.   AND AS WE CAN SEE, THE INCOME IS LISTED ABOVE THERE --

11   A.   CORRECT.

12   Q.   -- ON THE TOP OF PAGE 4?

13   A.   CORRECT.

14   Q.   AND IF YOU CAN JUST BRIEFLY, THE TOTAL MONTHLY INCOME

15   FOR THE BORROWER?

16   A.   BASED ON THIS, IT SAYS $40,749.

17   Q.   AND THE TOTAL MONTHLY EXPENSES?  UNDER THE "PRESENT"

18   COLUMN.

19   A.   THAT'S THEIR PRESENT HOME EXPENSES?

20   Q.   CORRECT.

21   A.   YEAH.  THEIR PRESENT HOME EXPENSES WAS $5,384.75.

22   Q.   AND JUST -- AND FINALLY DOWN BELOW, ASSETS AND

23   LIABILITIES, THE TOTAL ASSETS.

24   A.   7,874,871.

25   Q.   AND THE TOTAL LIABILITIES ON THE FAR RIGHT-HAND CORNER.

1    A.    991,304.

2    Q.    AND THE NET WORTH IN THE MIDDLE COLUMN.

3    A.    6,883,567.

4    Q.    AND IF YOU COULD JUST TURN TO THE NEXT PAGE.

5    A.    OKAY.

6    Q.    AND THE DWANE AVENUE HOUSE IS LISTED THERE, A SCHEDULE

7    OF REAL ESTATE OWNED.

8    A.    CORRECT.

9    Q.    AND THERE IS A "P.S." NEXT TO THAT.

10   A.    YES.

11   Q.    WHAT DOES THAT REFER TO?

12   A.    THAT INDICATES PENDING SALE.

13   Q.    WHAT DOES THAT MEAN?

14   A.    WELL, IT APPEARS FROM THIS LOAN APPLICATION THAT THE

15   CORONAS WERE SELLING DWANE AVENUE FOR 1.1 MILLION, AND

16   PURCHASING THIS OTHER PROPERTY FOR 740,000.

17   Q.    AND THEN GOING DOWN, SO THE PURCHASE PRICE WAS

18   740,000?

19   A.    THE PURCHASE PRICE OF THE CARAWAY COURT PROPERTY,

20   CORRECT.

21   Q.    AND THE LOAN WAS -- YOU WERE ASSISTING IN HELPING THEM

22   OBTAIN WAS 490,000?

23   A.    YES.   THAT'S WHAT THE LOAN APPLICATION SAYS, CORRECT.

24   Q.    AND IT SAYS CASH FROM BORROWER, $253,522?

25   A.    CORRECT.

1    Q.   WOULD THAT HAVE BEEN THE DIFFERENCE BETWEEN THE LOAN AND

2    THE COST OF THE HOUSE?

3    A.   THAT WOULD BE THE DIFFERENCE BETWEEN THE LOAN AND THE

4    COST OF THE HOUSE, AND WHATEVER CLOSING COSTS AND PREPAID

5    ITEMS ARE PAID, CORRECT.

6    Q.   AND JUST GOING BACK UP TO PENDING SALE, CAN YOU TELL IF

7    THE DOWN PAYMENT WOULD HAVE CAME FROM -- THE DIFFERENCE, THE

8    253,000 WOULD HAVE CAME FROM THE PENDING SALE OR --

9    A.   IF YOU GO TO PAGE 1, ON THE LOAN APPLICATION, IT SAYS

10   SOURCE OF DOWN PAYMENT, IT'S TYPED OUT "CHECKING/SAVINGS,"

11   AND THEN BELOW IT SAYS, "EQUITY FROM PENDING SALE."

12   Q.   THANK YOU.

13        AND THEN, AGAIN, IF WE COULD JUST HIGHLIGHT THE

14   SIGNATURES.

15        YOU TESTIFIED THEY BOTH SIGNED THIS APPLICATION.

16        MR. CROWLEY:  WAS THAT A QUESTION?

17        MR. DICKINSON:  THAT WAS A QUESTION.

18        THE WITNESS:  I'M SORRY.  CAN YOU REPEAT THE

19   QUESTION.

20   Q.   BY MR. DICKINSON:  AGAIN, THEY SIGNED THIS

21   APPLICATION?

22   A.   IT LOOKS LIKE THEY SIGNED THE LOAN APPLICATION.

23   Q.   6-25, 1999?

24   A.   YES.

25   Q.   JUST ONE MORE QUESTION.  IF YOU CAN GO UP UNDER

692

1    "DECLARATIONS," RIGHT ABOVE THAT.

2    A.   OKAY.

3    Q.   LINE J.  IF YOU COULD HIGHLIGHT THAT ON THE SCREEN.

4         THE QUESTION, ARE YOU A U.S. CITIZEN.

5    A.   CORRECT.

6    Q.   IS THERE AN ANSWER CHECKED FOR BORROWER?

7    A.   IT SAYS YES.

8    Q.   AND THE -- AND IS THERE A CHECK FOR CO-BORROWER?

9    A.   CORRECT.

10   Q.   AND DOWN BELOW, MR. CORONA SIGNED, OR THERE IS A

11   SIGNATURE, SIGNED BORROWER'S SIGNATURE?

12   A.   RIGHT.

13   Q.   AND THE SIGNATURE CO-BORROWER, CAN YOU READ THAT?  CAN

14   YOU MAKE THAT SIGNATURE OUT?

15   A.   IT SAYS TRACY D. CORONA.

16   Q.   AND BOTH OF THOSE ARE DATED 6-25, 1999?

17   A.   YES.

18        MR. DICKINSON:  ONE SECOND, YOUR HONOR.

19        NO FURTHER QUESTIONS, YOUR HONOR.

20                    CROSS-EXAMINATION

21   BY MR. CROWLEY:

22   Q.   GOOD AFTERNOON, MR. HELSEL.

23   A.   GOOD AFTERNOON.

24   Q.   I LIKE YOUR SHIRT.  PICK IT SPECIALLY?

25   A.   CASUAL DAY.

693

1    Q.   DO YOU HAVE THAT ONE PAGE --

2    A.   THE LETTER, YES, I DO.

3    Q.   IT'S PAGE 17.  SINCE WE'RE TESTING YOUR READING

4    ABILITIES, YOU ONLY READ THE FIRST LINE OF THAT PARAGRAPH.

5    AND TO COMPLETE IT, I THINK YOU SHOULD READ THE REST OF THE

6    PARAGRAPH.

7    A.   OKAY.  DO YOU WANT ME TO START AT THE BEGINNING OR FROM

8    WHERE I --

9    Q.   NO.  YOU CAN START AT THE SECOND SENTENCE.

10   A.   "OKAY.  AT THE TIME, I WAS THE DIRECTOR OF THE BANK OF

11   SOUTHERN CALIFORNIA.  BANK OF SOUTHERN CALIFORNIA WAS MY LAW

12   FIRM'S BUSINESS BANK.

13          "WE HAD AN ONGOING LINE OF CREDIT.  AT THE TIME, THE

14   BANK WAS UNDER REGULATORY SUPERVISION AND AS A RESULT CALLED

15   OUR LINE OF CREDIT DUE AND PAYABLE IMMEDIATELY.

16          "THE BANK DID NOT WISH TO RENEGOTIATE THE FIRM'S

17   LINE OF CREDIT, AS IT HAD DONE IN PRIOR YEARS.  AND AS I WAS

18   THE DIRECTOR OF THE BANK, I WAS PLACED IN A CONFLICT OF

19   INTEREST POSITION.

20          "I USED THE FUNDS FROM THE CONTINGENCY FEE TO PAY

21   THE LINE OF CREDIT OFF AND DELAYED THE PAYMENT OF TAXES."

22          KEEP GOING?

23          MR. CROWLEY:  NO.  THAT'S OKAY.  THANKS.

24          I DON'T HAVE ANY OTHER QUESTIONS.

25          MS. DOBRO:  THANK YOU.

1                        CROSS-EXAMINATION

2    BY MS. DOBRO:

3    Q.   ONE MORE.

4    A.   OKAY.  THAT'S FINE.

5    Q.   HI, MR. HELSEL.

6    A.   HI.

7    Q.   WHO TYPED THE LOAN APPLICATION, IF YOU REMEMBER?

8    A.   I WOULD -- MY PROCESSOR AT THE TIME WOULD HAVE DONE

9    THAT.

10   Q.   SO DID YOU COLLECT THE INFORMATION IN HANDWRITING AND

11   THEN GIVE IT TO SOMEONE IN THE NORMAL COURSE OF BUSINESS TO

12   PREPARE THE TYPED APP?

13   A.   EXCELLENT QUESTION.

14   Q.   THANK YOU.

15   A.   BECAUSE CLIENTS HATE FILLING OUT PAPERWORK, AND BEING A

16   MORTGAGE PROFESSIONAL, WHAT I DID BACK THEN, IS -- WHAT I

17   STILL DO NOW IS, I WILL ASSIST MY CLIENTS BY MAYBE DOING A

18   PHONE INTERVIEW OVER THE PHONE, GETTING AS MUCH INFORMATION,

19   REQUESTING INFORMATION FROM CLIENTS, AND THEN TYPING

20   EVERYTHING OUT.

21          SO THIS WOULD HAVE BEEN, LOOKING AT THE DETAIL OF

22   THIS APPLICATION, IT'S FAIR TO STATE THAT I HAD RECEIVED A

23   LOT OF INFORMATION PRIOR TO TYPING THIS OUT, PREPARED IT AND

24   THEN HAD THEM SIGN.

25          THIS IS AN ACTUAL HANDWRITTEN LOAN APPLICATION RIGHT

1    HERE, WHAT YOU'RE STARING AT.

2    Q.   OKAY.  AND TRACY CORONA IS NOT THE PERSON WHO PROVIDED

3    YOU THE INFORMATION PERSONALLY, IS SHE?

4    A.   NOT TO MY RECOLLECTION.  MOST LIKELY I HAD SPOKEN TO

5    RICK AND SAID, HERE IS WHAT I NEED.  WHERE IT CAME FROM, HOW

6    I GOT IT, I HAVE NO RECOLLECTION.

7    Q.   OKAY.  AND THE TAX LIEN THAT YOU DISCUSSED --

8    A.   YES.

9    Q.   -- THAT WAS A TAX LIEN THAT REGARDED TAX LIABILITIES

10   ACCRUED IN A YEAR, ONLY AGAINST RICK CORONA; IS THAT RIGHT?

11   A.   ONE SECOND, PLEASE.

12   Q.   THANK YOU.

13          MR. DICKINSON:  YOUR HONOR, CAN WE JUST HAVE --

14   IDENTIFY WHAT THE WITNESS IS LOOKING AT.

15          THE WITNESS:  YEAH.  I'M LOOKING FOR MY -- THE

16   CREDIT REPORT I RAN TO -- WHICH IN THIS BINDER I HAVE NO IDEA

17   WHERE IT IS.

18   Q.   BY MS. DOBRO:  IS IT SOMETHING THAT YOU HAD PREVIOUSLY

19   PROVIDED TO THE GOVERNMENT?

20   A.   I DIDN'T PROVIDE IT.  THE GOVERNMENT PROVIDED EVERYTHING

21   TO ME.  SO -- HERE.  LET ME ANSWER YOUR QUESTION.

22          SO THEY PROVIDED A CREDIT REPORT THAT I WOULD HAVE

23   RUN.  AND TO ANSWER -- WE'LL SEE IF WE CAN ANSWER YOUR

24   QUESTION.

25          WELL, I GUESS -- THIS IS THE COPY OF THE CREDIT

696

1    REPORT THAT WE RAN.  IT'S NOT LEGIBLE.  I CAN SEE -- IT

2    DIDN'T PHOTOCOPY, IS WHAT I MEAN BY NOT LEGIBLE.

3    Q.   DOES LOOKING AT --

4    A.   BUT MY POINT -- HERE IS MY POINT.  I CAN SEE THAT THERE

5    WAS TAX LIENS ON HERE.  I CAN'T TELL FROM THIS CREDIT REPORT

6    WHOSE TAX LIEN.  IT WAS ONE OR THE OTHER.

7    Q.   CAN YOU TELL WHAT YEAR THE TAX LIEN ACCRUED BY LOOKING

8    AT YOUR CREDIT REPORT?  IF YOU CAN.

9    A.   YEAH.  THE BIGGEST ISSUE HERE IS WHAT I WAS PROVIDED IS

10   NOT VERY LEGIBLE.

11        NOW, WOULD IT BE HELPFUL TO LOOK AT -- THERE IS

12   ANOTHER CREDIT REPORT I NEVER SAW THAT IS IN HERE.  I CAN

13   LOOK AT THAT, IF THAT HELPS ANYONE.

14   Q.   IF IT WOULD ANSWER THE QUESTION AS TO WHETHER THE LIEN

15   WAS ALSO AGAINST TRACY CORONA, I WOULD APPRECIATE IT; UNLESS

16   THE GOVERNMENT CAN DIRECT YOU, SINCE IT'S THEIR BINDER.

17        MR. DICKINSON:  YOUR HONOR, IF IT HELPS, I BELIEVE

18   IT'S CLEAR IN EVIDENCE THAT THERE WASN'T A TAX LIEN AGAINST

19   TRACY CORONA; SO WE'LL STIPULATE.

20        THE COURT:  THAT THERE WAS NOT?

21        MR. DICKINSON:  THERE WAS NOT.

22        MS. DOBRO:  SO STIPULATED.

23        THE COURT:  GOOD.

24        MS. DOBRO:  NO FURTHER QUESTIONS.

25        THE COURT:  ONCE AGAIN, THANK YOU.

697

1          MS. DOBRO:  THANK YOU VERY MUCH.

2          THE COURT:  MR. MAIETTA, ANY REDIRECT?  I'M SORRY.

3          MR. DICKINSON:  CAN I BE CLEAR.  A PERFECTED TAX

4   LIEN, SOMETHING THAT WOULD HAVE BEEN FILED WITH THE COUNTY IS

5   WHAT WE'LL STIPULATE TO.

6          THE COURT:  THAT REALLY DOESN'T MEAN MUCH TO ME.

7          WAS THERE A TAX LIEN THAT THIS GENTLEMAN WOULD HAVE

8   BEEN ABLE TO DISCOVER BY LOOKING AT THE TRW REPORT?

9          MR. DICKINSON:  NO, YOUR HONOR.

10         THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP

11  DOWN.

12         THE WITNESS:  OKAY.

13         THE COURT:  OKAY.  WELL, IT'S 2:25, ACCORDING TO MY

14  WATCH.  I COULD MOVE THE HAND AND THE CLOCK UP FIVE MINUTES,

15  BUT THAT WOULD BE CHEATING.

16         JUROR NO. 2:  I HAVE 27 AFTER.

17         THE COURT:  ALL RIGHT.  WELL, IT'S 2:30 SOMEWHERE,

18  I'M SURE.  AND I KNOW THAT MR. MAIETTA DOES NOT HAVE A

19  WITNESS THAT HE CAN PUT ON IN THREE MINUTES.

20         MR. MAIETTA:  NO.  BUT COULD I JUST MOVE IN THE BANK

21  RECORDS AT THIS TIME.

22         THE COURT:  THE BANK RECORDS.

23         MR. MAIETTA:  YES, SIR.  IF THEY DON'T HAVE ANY

24  OBJECTION, I'LL JUST MOVE THEM IN AND WE CAN LEAVE.

25         THE COURT:  ALL RIGHT.

698

1          MR. CROWLEY:  I'D HAVE TO KNOW WHAT WE'RE TALKING

2     ABOUT.

3          THE COURT:  THAT'S WHY I ASKED, THE BANK RECORDS.

4     WHAT EXACTLY ARE WE TALKING ABOUT?

5          MR. MAIETTA:  EXHIBITS 22-1 THROUGH 22-10.

6          MR. CROWLEY:  I'D HAVE TO LOOK.  I CAN'T TELL YOU AT

7     THE MOMENT.

8          THE COURT:  ALL RIGHT.  WELL, WE'LL GET THEM, OVER

9     THE WEEKEND, TO REVIEW IT.

10          LADIES AND GENTLEMEN, PLEASE REMEMBER THAT WE DO NOT

11     HAVE COURT ON MONDAY.  OKAY.  NOW, I TOLD YOU THAT AT THE

12     VERY BEGINNING, I HAVE MY OTHER CALENDAR THAT I HAVE TO

13     HANDLE ON MONDAY, AND IT GENERALLY TAKES PRETTY MUCH ALL DAY;

14     SO YOU WILL NOT BE BACK UNTIL TUESDAY MORNING AT 8:30.

15          BEFORE YOU GET UP AND LEAVE, LET ME GIVE YOU MY

16     ADMONITION.  I'M GOING TO GIVE IT TO YOU IN FULL, JUST

17     BECAUSE -- I KNOW YOU'VE HEARD IT A THOUSAND TIMES, BUT IT'S

18     IMPORTANT FOR YOU TO HEAR IT AGAIN OVER THE WEEKEND.

19          FIRST OF ALL, DO NOT DISCUSS THIS CASE OR ANYTHING

20     HAVING TO DO WITH THIS CASE AMONG YOURSELVES OR WITH ANYONE.

21     DO NOT READ, WATCH OR LISTEN TO ANY NEWS ACCOUNTS OF THIS

22     CASE, IF ANY.

23          DO NOT DO ANY INDEPENDENT RESEARCH, GO OUT AND LOOK

24     AT THE INTERNET.  DO NOT GO VISIT A SITE.  DO NOT GET ON THE

25     COMPUTER AND LOOK AT WESTLAW.  DO NOT GO LOOK FOR ANY BOOKS

699

1    IN THE LIBRARY.  DO NOT DO ANY INVESTIGATION ON YOUR OWN,

2    WHATSOEVER.

3         AND PLEASE, PLEASE, PLEASE KEEP AN OPEN MIND UNTIL

4    THE CASE HAS BEEN SUBMITTED TO YOU.

5         OKAY.  WITH THAT, YOU HAVE A VERY NICE WEEKEND.  AND

6    WE WILL SEE YOU ON TUESDAY MORNING.  OKAY.

7         (JURY ABSENT, 2:29 P.M.)

8         THE COURT:  WITH THAT, WE'RE ADJOURNED.

9         THANK YOU.

10        (PROCEEDINGS ADJOURNED AT 2:30 P.M.)

11                  --OOO--

12        C E R T I F I C A T I O N

13        I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
14   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND
     CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN THE
15   AFOREMENTIONED CAUSE; THAT SAID TRANSCRIPT IS A TRUE AND
     CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE
16   FORMAT USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS
     OF THE UNITED STATES JUDICIAL CONFERENCE.

17
          DATED:  AUGUST 6, 2007, AT SAN DIEGO, CALIFORNIA.
18
                              S/CAMERON P. KIRCHER
19                            CAMERON P. KIRCHER

20

21

22

23

24

25